Opinion of the court, by
Judge Wright:
On the trial of this cause, the following case was clearly made-out, in the mass of documentary and oral evidence given to the jury. In January, 1829, Jordan, one of the plaintiffs, commission merchant in Cincinnati, being in Boston, solicited of one L. Putnam, the purchase and consignment to his house, for sale, on commission, a quantity of domestic cottons, when it was agreed, that Jordan should select and ^purchase the goods in the name of L. Putnam, to be shipped to Jordan, Ellis & Co., to be sold on the joint account of the said L. Putnam, and his brother Edwin Putnam ; and that the proceeds should be remitted -to meet or pay the notes given for the goods, and therefore should not be drawn for. Jordan, with some little assistance from E. Putnam, selected the. goods, and agreed upon the price and credit, but finding L. Putnam’s credit doubted, could not effect the purchase on his notes-alone; and, finally, purchased three invoices of goods of different houses, amounting to upward of nine thousand dollars, at eight months, upon L. Putnam’s notes, payable to, and indorsed by himself, and indorsed by Jordan, Ellis & Co. The bills were taken and receipted in the name of L. Putnam, who seemed merely passive, by Jordan, who alone was active in the purchase. The bales were marked to J. E. & Co., Cincinnati — were taken by Jordan from the vendors, and shipped to C. D. Jordan, of New Orleans, or to assigns of J. E. & Co., and the bill of lading, dated January 15, 1829, was in the name of L. Putnam. Jordan paid the drayage, and effected insurance upon the shipment, in the name of J. E. & Co. to the amount of nine thousand and five hun *81 dred dollars, and paid (by his own note) the premium. The taking possession by Jordan, the shipment, insurance, and the-payment by him of the drayage and premium, was with the knowledge and assent of both Putnams, neither of whom ever had actual possession of the goods. With the bill of lading to New Orleans, the following letters of advice were sent by Putnam to C. D. Jordan, and to Jordan, Ellis & Co., by mail:
Boston, January 15,1829.
“Mr. C. D. Jordan — Dear Sir: Annexed you have a bill of lading for two hundred and fifty-eight bales of domestic goods,, which please forward to Jordan, Ellis & Co., of Cincinnati, per first good boat, together with your bill of charges.
“ Respectfully yours,
“ Lb Baron Putnam,
“ Per E. Putnam.”
*“ Boston, January 15, 1829.
“Messrs. Jordan, Ellis & Co. — Gentlemen: By this day’s mail have forwarded you invoice of brown shirtings and sheetings, and below you have my instructions. You will please dispose of the goods on the best terms. I should not advise a speedy sale of them, unless your market will admit of the same. I have bought .these goods on eight months’ credit, consequently .you will have more time to effect sales. Your Mr. Jordan informed me that you could place me in funds to meet my notes for the same; therefore shall not draw on you for the same. He will forward you a statement of the notes given. I'am of opinion that brown goods will be higher in this place in course of a month, at least five per cent. As I have bought them on good terms, and freighted them at very low rates,-1 am in hopes of realizing a profit of ten per cent. I am confident that goods of this kind will go up. If you obtain twelve and a half or thirteen for sheetings, and ten and a half for shirtings, I shall be satisfied. I wish my sales guarantied. Please write me on arrival of goods. You will please cause insurance of this shipment from New Orleans upon nine thousand five hundred dollars, being the amount insured here,
“Yours, etc.
1“ Le Baron Putnam,
“ Per E. Putnam.”
*82 C. D. Jordan received these goods at New Orleans, paid the freight, and on March 14, 1829, shipped them on board the steamboat Patriot, owned by the defendants, and then commanded by one of them, and received from the captain bills of lading to deliver to J. E. & Co., at Cincinnati, or their assigns, he or they paying freight at sixty-two and a half cents per hundred pounds, or if reshipped, seventy-five cents per hundred pounds, which he testified he did, as agent of J. E. & Co., under their instructions. Shortly after the shipment, and before February 11, 1829, Jordan drew up the following statement in writing and exhibited them to the Putnams for signature, which they refused:
“ I, the subscriber, of Boston, State of Massachusetts, have consigned to Jordan, Ellis & Co., of Cincinnati, Ohio, merchandise *to the amount of nine thousand three hundred and six dollars and sixty-nine cents; and for which the said Jordan, Ellis & Co. agree and promise to place me in funds, with the proceeds of the sale, for the payment of the herein described notes, being -given by me for the above merchandise consigned them:
January 7,1829, one note holden by T. Lord & Co., eight months, for......................................... $3,928 17
January 12,1829, one note holden by P. Blanchard & Co., eight months, for............................................... 2,483 02
January 7, 1829, one note holden by G. Richard & Co., eight months, for............................................... 2,895 50
$9,306 69
“ I also agree not to draw on the said Jordan, Ellis & Co., as I hold their obligation for the, fulfillment of the above agreement-Boston, January 12, 1829.”
Jordan at this time offered to give Putnam the following statement to be signed by J. E. & Co., in exchange for the above;
“We, the subscribers, of Cincinnati, Ohio, do hereby agree and •promise to place Mr. Le Baron Putnam, of Boston, in funds in sea■son for the payment of the here in-described notes, being given by him for merchandise, consigned us for sale, on his account:
January 9,1829, one note, eight months, for..................$3,928 17
« 12, “ “ “ “ .................. 2,183 02
“ 7 “ “ “ “ .................. 2,895 50
$9,306 69
“ Boston, January 12,1829.”
*83 Le Baron Putnam failed February 11, 1820, and assigned his effects to Bradley & Clark, for the benefit of his creditors, including in the schedule the invoices for the goods consigned to C. D. Jordan, merchant there (New Orleans), with orders to reship the same to Jordan, Ellis & Co., Cincinnati, Ohio, for sale, for and on account ofLe Baron Putnam.
*Invoice, $9,500, one and half per cent................. $142 50
Policy................................................................... 1 00
Freight................................................................. 80 00
Package................................................................ 5 00
228 50
9,306 69
$9,535 19
.And indorsed in blank, and delivered to Bradley & Clark, one of the bills of lading of the goods from Boston to New Orleans. Bradley & Clark, before they took the assignment, were informed that the notes given for the purchase of the goods were indorsed by J. E. & Co., and remained unpaid. About this time Edwin Putnam relinquished his claim upon the profits of the goods. A few days after the assignment Bradley, one of the assignees, came to Cincinnati to meet the goods, but as they had not arrived, went on to Louisville, and there waited for their arrival. While he was there one of the plaintiffs (Bellows) descended the river in a skiff, met the Patriot with the goods on board, near New Albany — went on board, and having stated to the captain that Bradley & Clark were on to get possession of the goods — that Bradley was at Louisville waiting their arrival; and that his (Bellows’) object was to take possession of the goods and retain the control, paid the freight. The bill of lading, signed at Few Orleans, was canceled, and a new one executed by the captain, recognizing J. E. & Co. as shippers, and undertaking to deliver to them or assigns at Shippingport or Louisville. On the arrival of the boat at Louisville, and before the goods were unladen, Bradley demanded the goods of the captain, under the. assignment. The captain gave an order to the clerk to deliver the goods to Bellows, but countermanded the order, when Bellows appeared with his drays to receive them. After some little delay the goods, through the agency of Bellows and Jones, were brought round the falls to Louisville, and it was finally agreed that they should be brought on to Cincinnati, and the rights *84 of the parties settled there. Captain James shipped the goods in-his own name on the Ben Franklin, and with Bellows *and Bradley came up on her to Cincinnati. On the passage Bellows-tendered' the captain the freight from Louisville to Cincinnati, and offered indemnity, which was refused by James. The boat arrived at Cincinnati on Sunday, and the goods were thrown out upon the-common landing of the city. They were taken possession of by defendants, and placed in their warehouse. Very early on Monday morning the goods were replevied upon the writ in this cause, after which, the same day, Bradley presented to the plaintiffs a. copy of the following letter, and proffered to pay the expenses on the goods. The plaintiffs, after perusing the letter, replied “ that it was not necessary to tender them any expenses they had incurred on account of the goods mentioned therein” (meaning, as the witness understood, that if tendered, they would not be accepted):.
“Boston, February 16,1829.
“ Messrs. Jordan, Filis & Co., Merchants in Cincinnati, Ohio.
“ Gentlemen : You are hereby informed that I have sold, transferred, and assigned to Messrs. Charles Bradley and John Clark, ' merchants in Boston, assignees of my effects, for the benefit of my creditors, the invoices of goods I shipped and consigned you for sales and returns about the 15th of January last past. You will-allow them, or either of them, or their agent, to receive and take possession of said goods, before or on their arrival at Cincinnati. In case said goods shall come into your possession before said Bradley and Clark, or either of them, or their agent, shall have received and taken possession of them, you will nevertheles deliver them to the said Bradley and Clark, or either of them, or their agent, Said Bradley and Clark will pay, or cause to be paid you, all charges you have on said goods for transportation and insurance thereon from Boston to Cincinnati. You are hereby directed not to make sale of said goods, and not to - dispose of them in any way whatever, excepting as above directed, without-the authority of the said Bradley and Clark. Yours, etc.,
“Le Baron Putnam.”
During the trial, evidence was offered, on the part of the plaintiffs, tending to prove that' the notes'given for the goods *were-indorsed by them with the knowledge and approbation of L. and- *85 ,E. Putnam, according to their original agreement; and that they -had specially agreed that the goods should be held by the plaintiffs to raise funds to pay the purchase money, and that Putnams were to have no other interest in them than the profits and loss; ¡and on the part of the defendants tending to prove that the notes had been indorsed by plaintiffs without the knowledge or consent of Putnams; and that Bradley, at Louisville, tendered to James ■the freight from New Orleans, and forbid him to deliver to the plaintiffs; which, as it was contradictory, it is not deemed advis.able to recapitulate here. The jury found for the plaintiffs, and the defendants now move for a new trial, because the court erred :in giving the cause to the jury..
In giving this cause to the jury, while commenting upon its various aspects, and having reference to the hypothetical cases supposed and urged, by counsel, the judge laid down the following .among other positions:
1. That the rights of the parties must be determined as they •stood' when the suit was commenced, and no tender made afterward of freight and advances by Bradley and Clark, or any tender made before, unless sufficient to cover all advances and liabilities accrued on account of the goods, could be taken into •consideration to affect their rights.
2. Where goods are consigned by the owner to a person who has no interest in the consignment, or has made no advance on .account of it, the owner may stop the goods while on their way to the consignee, and take possession to protect himself, and hold them for that purpose against the consignee.
3. That the delivery of goods to the master of a vessel, who is the carrier, is, constructively, a delivery to the consignee, subject to the right of stoppage in transitu.
4. If these goods were purchased by theqfiaintiffs for Putnams, -on the credit of the plaintiffs, or on their credit with that of Putnam, or even purchased by Putnam, and consigned to the plaintiffs, and they, by contract, express or implied, were induced to •make advances for freight, insuranee, or otherwise, they would thereby acquire a qualified property in the goods, and the right to .■retain the possession *until thejr advances were refunded, .and their liabilities discharged.
5. That if the plaintiffs had incurred responsibilities, or made ¿advances on account of the goods in good faith, resulting from their *86 undertaking with Putnam, they have a right to the possession of' the goods against the defendants, their carriers, if they have paid-< or tendered the freight.
6. That a carrier, upon a bill of lading, containing an express-stipulation to deliver to the consignee or his order, can not detain-the goods from the consignee, under a mere notice from the consignor ; and if he does, is liable on his contract for the damage, though a different rule might obtain upon a bill to deliver to the' consignee, or the assigns of the consignor.
7. That in many cases a symbolical delivery was all that was necessary, or the thing to be delivered was susceptible of; and the-jury might determine for themselves, whether the transaction on the Patriot, near New Albany, did not amount to an actual delivery to the plaintiffs, by the defendants, which they could not afterward' rescind.
We have no bankrupt laws in this country, and are, thereto^ in our investigations of this case, not subject to the embarrassing difficulties growing out of these laws, which have attended many of the English cases. The language of the charge to the jury is very imperfectly collected from the loose notes used on the trial, and although we may regret that it is not more explicit and clear, we must keep in view the case before the jury, to which it referred, and in reference to which alone, the jury received and understood it. It is not deemed necessary to pursue, the course of argument adopted by defendants’ counsel. It often exhibits great zeal and ability, but falls into frequent error as to what was in fact said by the court to the jury. The judges are satisfied with the verdict on the merits of the case in proof. Courts are always bound in the exercise of a sound discretion, to inquire how far the observations' of the judge complained of, were material as well as erroneous; and to what extent they affected the merits of the cause; otherwise there would be no end to new trials, and the remedy would be-worse than the wrong. 10 Johns. 451; 5 Term, 425; *3 Johns. 528; 1 Johns. Cas. 250; 2 Cow. 479; 8 Cow. 223; 6 Cow. 118; 5 Wend. 48; 5 Mass. 101; 6 Mass. 350; 3 Ohio, 369; 3 Ohio, 112; 4 Ohio, 39.
There can be no question but that the owner of a chattel may-part with his property in and dominion over it, without reeeivingthe pay for it; and he may deliver any chattel he sells, symbolically and constructively, as well as by corporal touch. If he sells with *87 out stipulation, for credit, or some other act indicating his intention to rely for his pay on the promise of the purchaser, or something other than the article contracted for, the law secures to him a lien on the chattel for its price, which he may assert at any time before actual delivery to the vendee. So entirely does the rule of law follow the principle of equity in this particular, that although there has been a constructive delivery to the purchaser, as to a middleman or a carrier upon a bill of lading, yet in case of real or apprehended insolvency in the vendee, it allows the vendor the privilege-of stopping the goods, if he can, on their way to the vendee, and having regained the possession to himself, to assert his lion for the unpaid purchase. It is essential to liens, that persons claiming-them have the possession of, the chattel upon which they are claimed to operate. This is defined to be the right which one pei’sonpossesses of detaining property placed in his hands, belonging to-another, until some demaxxd of his be satisfied. 3 East, 235; 2 Cow. 579. They are allowed for the convenience of commerce and natural justice, and are favored where there is an express contract, or-where it is implied from the dealings of the factor. 4 Barr, 2220. And in such cases, though the general property in the goods.is vested in the purchaser, the lien or special property is vested in the vendor. 1 H. Bl. 368; 2 Bl. Com. 448; 7 Term, 440; 7 East, 571.
The vendor’s right of stoppage in transitu does not proceed on the ground of rescinding the contract, but rests expressly upon its con tinuance on the ground of an equitable lien ; and if the goods are stopped, the vendee may recover them on his complying with the contract, or paying the price. Dyer, 29; 1 New. 69; Com. Dig., Agreement, B, 3; 3 Term, 464; 8 Term, 199; 3 P. Wms. 188; 2 H. Blk. 504; 3 Bos. *& Pul. 54; 12 Ves. 379. If the vendor has been paid in part, he may stop for the balance, and the part payment only diminishes the lien pro tanto. 2 Kent’s C. 427; 7 Term, 440-445; 1 H. Blk. 357, 363, n. 5; 3 B. & P. 44; 3 East, 93, 103, 381. This right does not exist except in ease of insolvency, and can only be exercised when the property, by the shipment, is vested in the consignee. 8 Cranch, 333, per Story, Judge. The title may pass by mere delivery of goods under a contx'act of sale; or a lien may be acquired for advances, by a mere possession, under a contract for that purpose. But it is of the very essence of a lien that possession accompanies it. Having acquired possession of goods, the consignee may be rightfully considered as the special- *88 owner of them, to the extent of his advances. Mason, 139. And there are many cases where the vendor’s right of stoppage has been defeated by a constructive delivery only. 2 Kent C. 431.
Factors have also liens upon the goods of their principals, for •charges incident to them, for a general balance due them as factors, and also for outstanding debts, for which they are only security. 3 P. Wms. 185; 2 Atk. 623; 2 Ver. 203; 1 Burr. 494; 4 Burr. 2214, sec. 18; 1 H. Blk. 501; 2 H. Blk. 503; 2 W. Blk. 1156; Cow. 251, 571; 6 Term, 258, 262; 2 East, 327; 6 East, 25, n.; 1 East, 4; 16 Ver. 280. As between the principal and factor, the general right of property in the owner will be made to yield to the special property of the factor, necessary to complete his trust or satisfy his liens. 2 H. Blk. 503. Yet the owner may, at any time before actual sale, by paying the balance, and discharging the responsibilities of the factor, withdraw his effects; and if the factor become insolvent, the goods remain the property of the principal, subject to the lien of the factor. 2 W. Blk. 1156. These liens are allowed for the convenience of trade, with a view to the nature of the factor’s employment, and to encourage advances upon goods-in his possession, or to be consigned to him, and are favored, 3 B. & P. 488, 498; and Lord Kenyon, 6 Term, 262, says, “ the factor’s right to his lien is an agreement which the law implies. If the factor has sold the goods, and parted with the possession, he has a lien on the price in the hands of the purchaser, *for what is due to him, and the owner can not set up his right to the money, except whero the factor has nothing due to him.” Cow. 256, 571; 1 Burr. 494; 1 East, 4; 5 Bin. 392. And where the owner aliens the property, the purchaser takes it subject to the lien of the factor. 1 Burr. 489. So for insurance upon the goods, made at request of consignor,.or in the course of trade. 1 Burr. 494; 2 East, 523. “ There is no doubt,” say the Supreme Court of the Uuited States, 8 Cranch, 419, “but that agreeably to the principles of the common law, a factor has a lien upon the goods of the principal in hid possession, for the balance of account due to him, and so has a consignee for advances made by him to the consignor. The consignor can not maintain an action against his factor, to recover the property placed in his possession, without first paying or tendering what is due to the factor.” Buller, Judge, says, 6 East, 28, n.: “ Where the consignee has paid the price of the goods, or is under acceptances for them, which is the same thing, the owner can not *89 seize them.” But as between a principal and a mere factor, who has neither advanced nor engaged anything for his principal, the principal has a right to take back his goods at will, whether they be actually in the factor’s possession, or only on their passage. 6 East, 25, n. So in case of the consignee’s insolvency, before they came to his possession. 6 East, 17; 3 Term, 119; 4 Burr. 3047; 2 Kent Com. 72; 2 Rob. Ad. 391. The right of the owner of goods to countermand their destination, while under his dominion, is not •questioned by these principles, but that is a right that can only exist where there is no interest in others in the goods, to be affected by the countermand.
A consignee upon a bill of lading to himself, or assigns, obtains .a property in the consignment by the bill of lading, and may sell .and transfer a title, while the goods are in transit, before they ever came to his actual possession, by indorsing the bill of lading, notwithstanding they have not been paid for; and Lord Mansfield, in 6 East, 27, n., says it has “ always been held that the delivery of a bill of lading transferred the property at law.” It has been determined that the moment goods are delivered by A. to a carrier, to be forwarded to B., *the property vests in B. 3 B. & P. 46. Where a factor makes advances and incurs responsibilities, on account of consignments to him, the bill of lading vests such property in him, that he may.insure, or even sell the goods, -on the security and faith of the consignment, and the consignor can not stop them, without repaying what he has advanced, or is liable for, and no man can seize goods in opposition to one who has obtained a legal right, and advanced money upon them. 6 East, 32, n. Yet the interest vested in the consignee, by the delivery to the captain is not absolute to all purposes. So far as relates to the right of stoppage in transitu, it continues subject to the control of the consignor. 8 Cranch, 329. A shipment to the order of the consignee, he to pay the freight, was held to change the custody of the goods, by delivery to the captain. 1 East, 5. The bill of lading is a written contract for the transportation of goods. Its stipulations are as obligatory upon the parties as other written contracts. Their terms can not be varied by a parol agreement, though they maybe affected by proof of usage or custom. 4 Ohio, 346. They are not conclusive against proof of fraud. 7 Mass. 306. The party in whose name the bill of lading is made out, has a right to demand the goods of the carrier, and if he be the con *90 signee' without interest, he may sell absolutely and transfer the* property, before he receives it. 8 Cro. 329.
The carrier’s right to hold goods against the consignee extends no farther than until he is paid for his carriage. 3 B. & P. 55; Ld. Raym. 752, 867; 6 East, 519; 7 East, 224. Chambres, Judge, in Opponheim v. Russett, 3 B. & P. 54, says, “Perhaps the consignee himself may intercept the goods in their passage; and indeed I have little doubt that if he' do intercept them in their passage, before the consignor has exercised his right of stopping in transitu, and do take an actual delivery from the carrier, before the goods get to the end of their journey, that such a delivery to him will be complete.” Opposed to this is cited the declaration of Lord Kenyon (1 East, 242), that the right of the consignee to go out to sea, and meet the ships, could not be supported, because it might go the length of saying *that the consigne® might meet the vessel coming out of the port whence she had been consigned,” and “there would then be no possibility of any stoppage in transitu at all.” This cause has been overruled. 2 B. & P. 461; 3 B. & P. 54. And the better opinion now is, that if the vendee intercept the goods on their passage, and take pos-session as owner, the delivery is complete, and the right of stoppage is gone. 2 Kent C. 433. And if the property has once fairly arrived at its destination, so as to give the vendee the actual exercise or dominion over it, the right is gone. 4 East, 82. The delivery of the key of the vendor’s warehouse to the purchaser, the paying storage for the goods, or the lodging an order with the keeper for their delivery, or the demanding and moving the goods by the agent of the vendee, have been held a sufficient delivery to take away the right to stop. 3 Term, 468; 1 Camp. 452; 2 Camp. 243; Caine, 182; 3 Term, 464; 14 East, 308, The securities are at an end if the goods are placed under the orders of the consignee at any intermediate place. 5 East, 175. In Coxe v. Harden, East, 218, it was held that upon a shipment to-consignees, on a bill of lading, to the shippers or their assigns, the possession by the consignee of the bill of lading without indorsement, though it did not entitle him to call upon the captain for their delivery, and although he might be liable, on his bills of lading, to deliver only to the order of the shippers, for a broach of that contract, yet when once the goods were in possession of the consignee, or “those who had authority from him, whether- *91 received rightfully or wrongfully from the captain, the right of stoppage ceased, and the property became indefeasibly vested,, without any further control of the shipper over it.” So it was-held that when goods were sent from Manchester to Hull, to be-from thence shipped to the consignees at Hamburg by their agent, the transit was at an end on their arrival at Hull. 5 East, 175. The supposition that the goods must come to the corporal touch of the consignee, in order to oust the right of stopping in transitu, is a figurative expression, rarely, if ever, strictly true. 5 East, 184. It has never been literally adhered to, 3 Term, 463, and is now exploded. 2 Kent C. 431.
*A written opinion of a highly distinguished jurist in Boston, has been submitted to us by the defendants’ counsel, that the right of a vendor “ to stop in transitu is undoubted, unless the consignee has obtained a vested interest in the goods,” and that to-’ establish the lien there must be an agreement for it, and actual or constructive possession ; and concluding “ that if there was no advancement on the goods, and no responsibility assumed to the-vendors, there could be no foundation for the lien to rest on.” With this opinion, so far as it asserts the law, we fully concur. The only difficulty for the defendants will be in bringing their case within its principles. The assignment of Putnam to Bradley and Clark has no other effect upon the case than to place them, from its date, in Putnam’s shoes, and to enable them thenceforth to do exactly what he might have done if it had never been made, and nothing more. What, then, were the legal rights of these-parties ?
The general question is, whether this consignor shall be held.obliged to do justice to the plaintiffs before he is suffered to retake these goods ? And it is said, if a court of equity would sustain the demand in this class of cases, upon the broad principles-of justice, it is good at law. 4 Burr. 2218, 2220. Before these goods were purchased it was agreed that they should be bought on credit, shipped to the plaintiffs, who should sell them, and raise and remit funds to meet the notes given for the purchase. The-obligations given on the purchase were indorsed by the plaintiffs. The fair inference from this state of facts would be that tho indorsement was made in execution of the agreement; if so, it is-conceded the lien of Putnam is gone. Whether that was the fact was left to the jury, and if found, the lien gave the plaintiffs- *92 power to retain possession of the goods until indemnified, and so the jury must have understood the court. The same rule applies if any advances were made, or liabilities incurred upon the shipment, with the knowledge and consent of Putnam, for drayage, insurance, or freight. The difference is only in the extent of the lien. The letter of advieo of the shipment showed an agreement to rely on the promise of one of the plaintiffs to remit funds to meet the notes given for the purchase; the proceeds were not to be *drawn for. It also contained a request to obtain insurance from New Orleans up on the faith of the consignment. The bill • of lading to New Orleans, and the letter, of advice sent with it, -showed the freight, to that place, unpaid and chargeable on the shipment to the plaintiffs, and which was paid there by the agent of the plaintiffs. The schedule accompanying the assignment to Clark and Bradley contained the name of the vendors of the goods, the amounts, and also a memorandum of two hundred and twenty-eight dollars and fifty cents of insurance, freight, and drayage, chargeable upon the invoices. If the indorsements there for the purchase are thrown entirely o.ut of view, here were advances under liabilities on account of these goods by the plaintiffs, and the shipment to them and delivery to the carrier was con- • structively a possession in them, to the extent of that lien, subject to the right of stoppage in transitu, when discharged by the -•consignor. If the indorsement on the notes were without the knowledge and consent of Putnam, he had no right to stop these goods without paying or tendering the advances actually made .and the expenses incurred. There was no evidence of any attempt on the part of Putnam to satisfy this lien until after suit ■brought; and it can not s*eriously be urged that a tender afterward affected the case. The claim of a right to hold for a greater lien, which it is supposed1 would be held equivalent to a refusal, was made at the same time, if at all. Having then got the possession, at the end of the voyage, the lien of the plaintiffs upon • common principles, would attach for all their liabilities, though if payment had been before tendered, upon a proper state of pleading, the lien for the unauthorized liabilities might have been ..avoided. It was properly left to the jury to determine also the character of the possession below Louisville; for although it .might be obtained expressly to prevent a stoppage by the consignor, yet- it might be good to the extent above supposed, if no *93 further, and if not limited by payment or tender until after the-goods arrived at the end of the voyage, might possibly be effectual to the whole extent claimed. In these particulars I do not see how the jury can have been misled to the prejudice of the defendants by the charge of the court. The order for delivery, given to Clark and Bradley, was only upon their ^paying all charges on said goods, for transportation and insurance, from Boston to Cincinnati! This was no countermand by a consignor-having the sole interest in the goods. It was no attempt to stop-in transitu, on account of the insolvency of the vendee, for there was no insolvency, nor proof of any. No moral turpitude is perceived in the measures resorted to in order to obtain the actual possession of these goods below Louisville. It is but an ordinary contest between two claimants, each having a constructive, and striving to secure an actual possession to promote his own interest. If it be true, as urged, that a constructive possession can not become the base of a lien, that is fatal to Putnam’s claim. He never had actual possession, and probably never saw the goods. The actual possession had been taken by one of the plaintiffs; and the claim of .possession in Putnam is entirely constructive, springing from his ownership of the goods.
Passing from these considerations, what was the situation of these goods at New Orleans? If, upon their arrival there, all had been done by the shippers they were to do to give possession to the plaintiffs, and they were delivered to the agent of the plaintiffs for their direction as to their ultimate destination, then the transit of the goods ended there, and the possession of the plaintiff was then complete. Jordan swears that he received the goods and reshipped them as the agent of the plaintiffs, under their instructions. He debited them with the expenses and forwarded the bill, according to order. The bill of lading sent to him made the goods deliverable to him on the order of the plaintiffs. Can it be doubted that the plaintiffs might have countermanded the delivery to Jordan at New Orleans, and directed the goods elsewhere or there taken them to themselves ? The bill of lading, executed by the defendants there, was a contract between the plaintiffs and the defendants, by which the defendants acknowledge to have received these goods for the plaintiffs, and promise to deliver them at Cincinnati to them or their order. The law confers no power upon one party to a contract to rescind it at his own pleasure. *94 ’The consent of both parties is as necessary to its dissolution as to its formation. Is there any principle of justice or equity, growing out of the circumstances of this ease, protecting the defendants *in their refusal to execute this contract ? None is disclosed. But the parties to the contract did cancel it near New Albany, and entered into a new one to deliver the goods at Louisville. Was it unlawful for them to do so ? Why did the defendants refuse compliance with it? Not because they were defrauded or imposed upon, but because the agent of Putnam demanded the goods and notified them not to fulfill the agreement. ’The arrangement to bring the goods on to Cincinnati afterward can not injuriously affect the plaintiffs. They might be charged with the additional transportation. But the carrier’s lien for this, if it ever attached, was destroyed by the tender and refusal on the way, as was that for the transportation from New Orleans to Louisville by the payment on the river. At Cincinnati the originally contemplated voyage was complete; the whole freight had been paid, or tendered and refused. There remains no shadow of lien for carriage on the part of the defendants. A lien once parted with can not be resumed. Abbott on Ship. 246; 6 East, 662. If the consignee requires a delivery to him on board the ship, and directs the goods not to be landed, it is said the master must obey. 4 Term, 260. The general rule is, when there is no special agreement or custom to the contrary, that a deliverance must be to the consignee in person; but if there is a custom or agreement, then a delivery at the wharf discharges the master. 5 Term, 389; 3 Bod. & Bing. 177; 6 Moore, 469; 4 Price, 34; 2 Barn. & Ald. 356; 2 Barn. & Ald. 58; 1 McClel. & Young, 129; 4 Bing. 476.
The question remains, what right had the defendants, who are mere carriers, to take these goods from the wharf at Cincinnati to their store-house, and defend their possession against the very ■persons with whom and to whom they covenanted to deliver them? Their charge had been fully paid and tendered. The demand interposed by Bradley and Clark, in no event can go beyond their rights. The consignees were solvent; their circumstances had un■dergone no change since the shipment of the goods upon an agreement that they should advance freight and insurance, and have the profit of selling, which confers upon the vendors any equitable right to interfere with the contract, to prevent great and unjust loss. There was nothing which, by the terms of their contract *95 *with Putnam, in any aspect of it, they were to do, to be entitled under the contract that remained undone. It is not a ■case of a naked shipment without contract or interest in the consignee. The right of Putnam, therefore, to rescind the contract at his own pleasure is not very apparent. By the issues, the defendants claim no right in themselves; and the jury had a right to consider the facts, and have the law given them upon each issue in the cause.
The defendants conduct their defense for the benefit of Bradley and Clark; yet much is said about the hardship of the case, and we are admonished that our decision not only involves the commercial character and credit of the state, but the character of the judiciary also. It was in evidence that the plaintiffs offered the defendants ample indemnity against loss from a delivery to them, which was refused. If they be now without indemnity it is their •own folly, and calls for little sympathy even from those in a situation to yield to its influence. Conflicting claims'to goods often .arise, and it is difficult for a carrier to know who has the right. In such cases, Chancellor Kent, in his 3 Com. 170, says, " pru dence would dictate that he deliver the goods to the person on whose indemnity he can most safely rely.” Again, “if the consignee has failed, and the goods have not been actually sold by him on their transit, he should, without doubt, deliver to the consignor; if otherwise, to the consignee. The consignor having made a consignment has not an unlimited power to vary it at pleasure. He may do it only for the purpose of protecting himself against the insolvency of the buyer or consignee. If the difficulty be great he may deposit with some bailee, and compel the contending parties by bill of interpleader to litigate their rights between themselves.” 3 Kent, 6, 171; Abbott on Ship. 381; 6 Rob. Ad. 321. Without some step of this kind we do not see how he can defend his possession against the express terms of his own bill of lading, by which he is excused from delivering only by the act of God and the public enemies. Co. Lit. 89, a; 3 Esp. 127; 1 Wil. 281. The commencement of this suit did not prevent a resort to the bill of interpleader, to secure the control of the goods for the benefit of the successful party; but no step of that kind is taken. Upon a view of all the circumstances of the *case we are satisfied that both the law and the facts are with the verdict. The motion is overruled.
*96 The defendants’ counsel, in the event of a decision against them on the motion for a new trial, have interposed a motion in arrest of judgment, on the ground that tho plaintiffs’ replications and pleas to the avowries are departures from their declaration :
1. In declaring upon a property in themselves, and in their replications and pleas setting up a lien.
2. In declaring for an unlawful taking, and setting up in their replications and pleas only an unlawful detainer.
The usual method of taking advantage of a departure in pleading is upon demurrer. Here the parties joined several issues to the country, and a verdict has passed. The defendants come with a bad grace now with objection to a judgment, because there was a departure in pleading which they chose to overlook at the proper time. Tet if the issues are so perfectly immaterial that thq court can not know for whom to give judgment, it is not aided by the verdict, and a repleader will be awarded. In this case there are several issues upon which no departure is alleged, and against which no want of materiality is urged. The verdict on the first-finds the defendants guil ty of the matter alleged against them i n the declaration ; on the second, that they took the goods; on the third, that the property was not in Bradley and Clark. Without- a necessity for looking further, we can easily see on these issues for whom to render judgment. Indeed, it would be difficult to find a departure in pleading here, if the question was properly presented. A new trial is never granted for a defect in the pleading. 1 Johns. 510; 15 Johns. 212.
The motion can not be sustained. Judgment on the verdict.