(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TORRES *v.* MADRID ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 19–292.  Argued October 14, 2020—Decided March 25, 2021

Respondents Janice Madrid and Richard Williamson, officers with the New Mexico State Police, arrived at an Albuquerque apartment complex to execute an arrest warrant and approached petitioner Roxanne Torres, then standing near a Toyota FJ Cruiser.  The officers attempted to speak with her as she got into the driver's seat.  Believing the officers to be carjackers, Torres hit the gas to escape.  The officers fired their service pistols 13 times to stop Torres, striking her twice.  Torres managed to escape and drove to a hospital 75 miles away, only to be airlifted back to a hospital in Albuquerque, where the police arrested her the next day.  Torres later sought damages from the officers under 42 U. S. C. §1983.  She claimed that the officers used excessive force against her and that the shooting constituted an unreasonable seizure under the Fourth Amendment.  Affirming the District Court's grant of summary judgment to the officers, the Tenth Circuit held that "a suspect's continued flight after being shot by police negates a Fourth Amendment excessive-force claim."  769 Fed. Appx. 654, 657.

*Held*: The application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued.  Pp. 3–18.

   (a) The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  This Court's precedents have interpreted the term "seizure" by consulting the common law of arrest, the "quintessential" seizure of the person.  *Payton* v. *New York*, 445 U. S. 573, 585; *California* v. *Hodari D.*, 499 U. S. 621, 624.  In *Hodari D.*, this Court explained that the common law considered the application of physical force to the body of a person with the intent to restrain to be an arrest—not an attempted arrest—even if the person does not yield.

*Id.*, at 624–625.  A review of the pertinent English and American deci-
sions confirms that the slightest touching was a constructive detention
that would complete the arrest.  See, *e.g., Genner* v. *Sparks*, 6 Mod.
173, 87 Eng. Rep. 928.

The analysis does not change because the officers used force from a
distance to restrain Torres.  The required "corporal seising or touching
the defendant's body," 3 W. Blackstone, Commentaries on the Laws of
England 288 (1768), can be as readily accomplished by a bullet as by
the end of a finger.  The focus of the Fourth Amendment is "the privacy
and security of individuals," not the particular form of governmental
intrusion.  *Camara* v. *Municipal Court of City and County of San Fran-
cisco*, 387 U. S. 523, 528.

The application of force, standing alone, does not satisfy the rule
recognized in this decision.  A seizure requires the use of force with
intent to restrain, as opposed to force applied by accident or for some
other purpose.  *County of Sacramento* v. *Lewis*, 523 U. S. 833, 844.  The
appropriate inquiry is whether the challenged conduct objectively
manifests an intent to restrain.  *Michigan* v. *Chesternut*, 486 U. S. 567,
574.  This test does not depend on either the subjective motivation of
the officer or the subjective perception of the suspect.  Finally, a sei-
zure by force lasts only as long as the application of force unless the
suspect submits.  *Hodari D.*, 499 U. S., at 625.  Pp. 3–11.

(b)  In place of the rule that the application of force completes an
arrest, the officers would assess all seizures under one test: intentional
acquisition of control.  This alternative approach finds support in nei-
ther the history of the Fourth Amendment nor this Court's precedents.
Pp. 11–16.

(1) The officers attempt to recast the common law doctrine recog-
nized in *Hodari D.* as a rule applicable only to civil arrests.  But the
common law did not define the arrest of a debtor any differently from
the arrest of a felon.  Treatises and courts discussing criminal arrests
articulated a rule indistinguishable from the one applied to civil ar-
rests at common law.  Pp. 11–14.

(2) The officers' contrary test would limit seizures of a person to
"an intentional acquisition of physical control."  *Brower* v. *County of
Inyo*, 489 U. S. 593, 596.  While that test properly describes seizures
by control, seizures by force enjoy a separate common law pedigree
that gives rise to a separate rule.  A seizure by acquisition of control
involves either voluntary submission to a show of authority or the ter-
mination of freedom of movement.  But as common law courts recog-
nized, any such requirement of control would be difficult to apply to
seizures by force.  The officers' test will often yield uncertainty about
whether an officer succeeded in gaining control over a suspect.  For
centuries, the rule recognized in this opinion has avoided such line-

drawing problems. Pp. 14–16.

 (c) The officers seized Torres by shooting her with the intent to restrain her movement. This Court does not address the reasonableness of the seizure, the damages caused by the seizure, or the officers' entitlement to qualified immunity. Pp. 17–18.

769 Fed. Appx. 654, vacated and remanded.

 ROBERTS, C. J., delivered the opinion of the Court, in which BREYER, SOTOMAYOR, KAGAN, and KAVANAUGH, JJ., joined. GORSUCH, J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined. BARRETT, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 19–292

## ROXANNE TORRES, PETITIONER *v.* JANICE MADRID, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[March 25, 2021]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The Fourth Amendment prohibits unreasonable "seizures" to safeguard "[t]he right of the people to be secure in their persons." Under our cases, an officer seizes a person when he uses force to apprehend her. The question in this case is whether a seizure occurs when an officer shoots someone who temporarily eludes capture after the shooting. The answer is yes: The application of physical force to the body of a person with intent to restrain is a seizure, even if the force does not succeed in subduing the person.

I

At dawn on July 15, 2014, four New Mexico State Police officers arrived at an apartment complex in Albuquerque to execute an arrest warrant for a woman accused of white collar crimes, but also "suspected of having been involved in drug trafficking, murder, and other violent crimes." App. to Pet. for Cert. 11a. What happened next is hotly contested. We recount the facts in the light most favorable to petitioner Roxanne Torres because the court below granted summary judgment to Officers Janice Madrid and Richard

Williamson, the two respondents here. *Tolan* v. *Cotton*, 572 U. S. 650, 655–656 (2014) (*per curiam*).

The officers observed Torres standing with another person near a Toyota FJ Cruiser in the parking lot of the complex. Officer Williamson concluded that neither Torres nor her companion was the target of the warrant. As the officers approached the vehicle, the companion departed, and Torres—at the time experiencing methamphetamine withdrawal—got into the driver's seat. The officers attempted to speak with her, but she did not notice their presence until one of them tried to open the door of her car.

Although the officers wore tactical vests marked with police identification, Torres saw only that they had guns. She thought the officers were carjackers trying to steal her car, and she hit the gas to escape them. Neither Officer Madrid nor Officer Williamson, according to Torres, stood in the path of the vehicle, but both fired their service pistols to stop her. All told, the two officers fired 13 shots at Torres, striking her twice in the back and temporarily paralyzing her left arm.

Steering with her right arm, Torres accelerated through the fusillade of bullets, exited the apartment complex, drove a short distance, and stopped in a parking lot. After asking a bystander to report an attempted carjacking, Torres stole a Kia Soul that happened to be idling nearby and drove 75 miles to Grants, New Mexico. The good news for Torres was that the hospital in Grants was able to airlift her to another hospital where she could receive appropriate care. The bad news was that the hospital was back in Albuquerque, where the police arrested her the next day. She pleaded no contest to aggravated fleeing from a law enforcement officer, assault on a peace officer, and unlawfully taking a motor vehicle.

Torres later sought damages from Officers Madrid and Williamson under 42 U. S. C. §1983, which provides a cause

of action for the deprivation of constitutional rights by persons acting under color of state law. She claimed that the officers applied excessive force, making the shooting an unreasonable seizure under the Fourth Amendment. The District Court granted summary judgment to the officers, and the Court of Appeals for the Tenth Circuit affirmed on the ground that "a suspect's continued flight after being shot by police negates a Fourth Amendment excessive-force claim." 769 Fed. Appx. 654, 657 (2019). The court relied on Circuit precedent providing that "no seizure can occur unless there is physical touch or a show of authority," and that "such physical touch (or force) must terminate the suspect's movement" or otherwise give rise to physical control over the suspect. *Brooks* v. *Gaenzle*, 614 F. 3d 1213, 1223 (2010).

We granted certiorari. 589 U. S. \_\_\_ (2019).

## II

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." This case concerns the "seizure" of a "person," which can take the form of "physical force" or a "show of authority" that "in some way restrain[s] the liberty" of the person. *Terry* v. *Ohio*, 392 U. S. 1, 19, n. 16 (1968). The question before us is whether the application of physical force is a seizure if the force, despite hitting its target, fails to stop the person.

We largely covered this ground in *California* v. *Hodari D.*, 499 U. S. 621 (1991). There we interpreted the term "seizure" by consulting the common law of arrest, the "quintessential 'seizure of the person' under our Fourth Amendment jurisprudence." *Id.*, at 624. As Justice Scalia explained for himself and six other Members of the Court, the common law treated "the mere grasping or application of physical force with lawful authority" as an arrest, "whether or not it succeeded in subduing the arrestee." *Ibid.*; see *id.*, at 625 ("merely touching" sufficient to constitute an arrest).

Put another way, an officer's application of physical force to the body of a person "'for the purpose of arresting him'" was itself an arrest—not an *attempted* arrest—even if the person did not yield. *Id.*, at 624 (quoting *Whithead* v. *Keyes*, 85 Mass. 495, 501 (1862)).

The common law distinguished the application of force from a show of authority, such as an order for a suspect to halt. The latter does not become an arrest unless and until the arrestee complies with the demand. As the Court explained in *Hodari D.*, "[a]n arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." 499 U. S., at 626 (emphasis in original).

*Hodari D.* articulates two pertinent principles. First, common law arrests are Fourth Amendment seizures. And second, the common law considered the application of force to the body of a person with intent to restrain to be an arrest, no matter whether the arrestee escaped. We need not decide whether *Hodari D.*, which principally concerned a show of authority, controls the outcome of this case as a matter of *stare decisis*, because we independently reach the same conclusions.

At the adoption of the Fourth Amendment, a "seizure" was the "act of taking by warrant" or "of laying hold on suddenly"—for example, when an "officer seizes a thief." 2 N. Webster, An American Dictionary of the English Language 67 (1828) (Webster) (emphasis deleted). A seizure did not necessarily result in actual control or detention. It is true that, when speaking of property, "[f]rom the time of the founding to the present, the word 'seizure' has meant a 'taking possession.'" *Hodari D.*, 499 U. S., at 624 (quoting 2 Webster 67). But the Framers selected a term—seizure— broad enough to apply to all the concerns of the Fourth Amendment: "persons," as well as "houses, papers, and effects." As applied to a person, "[t]he word 'seizure' readily bears the meaning of a laying on of hands or application of

physical force to restrain movement, even when it is ultimately unsuccessful." 499 U. S., at 626. Then, as now, an ordinary user of the English language could remark: "She seized the purse-snatcher, but he broke out of her grasp." *Ibid.*

The "seizure" of a "person" plainly refers to an arrest. That linkage existed at the founding. Samuel Johnson, for example, defined an "arrest" as "[a]ny . . . seizure of the person." 1 A Dictionary of the English Language 108 (4th ed. 1773). And that linkage persists today. As we have repeatedly recognized, "the arrest of a person is quintessentially a seizure." *Payton* v. *New York*, 445 U. S. 573, 585 (1980) (internal quotation marks omitted); see *Hodari D.*, 499 U. S., at 624.

Because arrests are seizures of a person, *Hodari D.* properly looked to the common law of arrest for "historical understandings 'of what was deemed an unreasonable search and seizure when the Fourth Amendment was adopted.'" *Carpenter* v. *United States*, 585 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 6) (quoting *Carroll* v. *United States*, 267 U. S. 132, 149 (1925); alteration omitted). Sometimes the historical record will not yield a well-settled legal rule. See, *e.g.*, *Atwater* v. *Lago Vista*, 532 U. S. 318, 327–328 (2001); *Payton*, 445 U. S., at 593–596. We do not face that problem here. The cases and commentary speak with virtual unanimity on the question before us today.

The common law rule identified in *Hodari D.*—that the application of force gives rise to an arrest, even if the officer does not secure control over the arrestee—achieved recognition to such an extent that English lawyers could confidently (and accurately) proclaim that "[a]ll the authorities, from the earliest time to the present, establish that a corporal touch is sufficient to constitute an arrest, even though the defendant do not submit." *Nicholl* v. *Darley*, 2 Y. & J. 399, 400, 148 Eng. Rep. 974 (Exch. 1828) (citing *Hodges* v. *Marks*, Cro. Jac. 485, 79 Eng. Rep. 414 (K. B. 1615)). The

slightest application of force could satisfy this rule. In *Genner* v. *Sparks*, 6 Mod. 173, 87 Eng. Rep. 928 (Q. B. 1704), the defendant did not submit to the authority of an arrest warrant, but the court explained that the bailiff would have made an arrest if he "had but touched the defendant even with the end of his finger." *Ibid.*, 87 Eng. Rep., at 929. So too, if a "bailiff caught one by the hand (whom he had a warrant to arrest) as he held it out of a window," that alone would accomplish an arrest. *Anonymus*, 1 Vent. 306, 86 Eng. Rep. 197 (K. B. 1677). The touching of the person—frequently called a laying of hands—was enough. See *Dunscomb* v. *Smith*, Cro. Car. 164, 79 Eng. Rep. 743 (K. B. 1629). Only later did English law grow to recognize arrest without touching through a submission to a show of authority. See *Horner* v. *Battyn*, Bull. N. P. 62 (K. B. 1738), reprinted in W. Loyd, Cases on Civil Procedure 798 (1916). Even so, the traditional rule persisted that all an arrest required was "corporal seising or touching the defendant's body." 3 W. Blackstone, Commentaries on the Laws of England 288 (1768) (Blackstone).

Early American courts adopted this mere-touch rule from England, just as they embraced other common law principles of search and seizure. See *Wilson* v. *Arkansas*, 514 U. S. 927, 933 (1995). Justice Baldwin, instructing a jury in his capacity as Circuit Justice, defined an arrest to include "touching or putting hands upon [the arrestee] in the execution of process." *United States* v. *Benner*, 24 F. Cas. 1084, 1086–1087 (No. 14,568) (CC ED Pa. 1830). State courts agreed that "any touching, however slight, is enough," *Butler* v. *Washburn*, 25 N. H. 251, 258 (1852), provided the officer made his intent to arrest clear, see *Jones* v. *Jones*, 35 N. C. 448, 448–449 (1852). Courts continued to hold that an arrest required only the application of force—not control or custody—through the framing of the Fourteenth Amendment, which incorporated the protections of the Fourth Amendment against the States. See *Whithead*,

85 Mass., at 501; *Searls* v. *Viets*, 2 Thomp. & C. 224, 226
(N. Y. Sup. Ct. 1873); *State* v. *Dennis*, 16 Del. 433, 436–437,
43 A. 261, 262 (1895); see also H. Voorhees, The Law of Ar-
rest in Civil and Criminal Actions §74, p. 44 (1904).

Stated simply, the cases "abundantly shew that the
slightest touch [was] an arrest in point of law." *Nicholl*, 2
Y. & J., at 404, 148 Eng. Rep., at 976. Indeed, it was not
even required that the officer have, at the time of such an
arrest, "the power of keeping the party so arrested under
restraint." *Sandon* v. *Jervis*, El. Bl. & El. 935, 940, 120 Eng.
Rep. 758, 760 (Q. B. 1858). The consequences would be
"pernicious," an English judge worried, if the question of
control "were perpetually to be submitted to a jury." *Ibid.*;
cf. 3 Blackstone 120 (describing how "[t]he least touching of
another's person" could satisfy the common law definition
of force to commit battery, "for the law cannot draw the line
between different degrees of violence").

This case, of course, does not involve "laying hands,"
*Sheriff* v. *Godfrey*, 7 Mod. 288, 289, 87 Eng. Rep. 1247 (K. B.
1739), but instead a shooting. Neither the parties nor the
United States as *amicus curiae* suggests that the officers'
use of bullets to restrain Torres alters the analysis in any
way. And we are aware of no common law authority ad-
dressing an arrest under such circumstances, or indeed any
case involving an application of force from a distance.

The closest decision seems to be *Countess of Rutland's
Case*, 6 Co. Rep. 52b, 77 Eng. Rep. 332 (Star Chamber
1605). In that case, serjeants-at-mace tracked down Isabel
Holcroft, Countess of Rutland, to execute a writ for a judg-
ment of debt. They "shewed her their mace, and touching
her body with it, said to her, we arrest you, madam." *Id.*,
at 54a, 77 Eng. Rep., at 336. We think the case is best un-
derstood as an example of an arrest made by touching with
an object, for the serjeants-at-mace announced the arrest at
the time they touched the countess with the mace. See, *e.g.*,

*Hodges*, Cro. Jac., at 485, 79 Eng. Rep., at 414 (similar announcement upon laying of hands). Maybe the arrest could be viewed as a submission to a show of authority, because a mace served not only as a weapon but also as an insignia of office. See Kelly, The Great Mace, and Other Corporation Insignia of the Borough of Leicester, 3 Transactions of the Royal Hist. Soc. 295, 296–301 (1874). But that view is difficult to reconcile with the fact that English courts did not recognize arrest by submission to a show of authority until the following century. See *supra*, at 6.*

However one reads *Countess of Rutland*, we see no basis for drawing an artificial line between grasping with a hand and other means of applying physical force to effect an arrest. The dissent (though not the officers) argues that the common law limited arrests by force to the literal placement of hands on the suspect, because no court published an opinion discussing a suspect who continued to flee after being hit with a bullet or some other weapon. See *post*, at 18–20 (opinion of GORSUCH, J.). This objection calls to mind the unavailing defense of the person who "persistently denied that he had laid hands upon a priest, for he had only cudgelled and kicked him." 2 S. Pufendorf, De Jure Naturae et Gentium 795 (C. Oldfather & W. Oldfather transl. 1934). The required "corporal seising or touching the defendant's body" can be as readily accomplished by a bullet as by the end of a finger. 3 Blackstone 288.

We will not carve out this greater intrusion on personal security from the mere-touch rule just because founding-

_____

*The arrest was not Isabel's first brush with the law or money troubles. A decade earlier, Elizabeth Charlton sued to recover for the estate of her husband, the fourth Earl of Rutland, an assortment of jewels allegedly taken by Isabel, the widow of the third Earl of Rutland. Elizabeth bested Isabel in the clash of the countesses, and Isabel was found liable for 940 pounds, worth about $400,000 today. *Elizabeth Countess of Rutland* v. *Isabel Countess of Rutland*, Cro. Eliz. 377, 78 Eng. Rep. 624 (C. P. 1595).

era courts did not confront apprehension by firearm. While firearms have existed for a millennium and were certainly familiar at the founding, we have observed that law enforcement did not carry handguns until the latter half of the 19th century, at which point "it bec[a]me possible to use deadly force from a distance as a means of apprehension." *Tennessee* v. *Garner*, 471 U. S. 1, 14–15 (1985). So it should come as no surprise that neither we nor the dissent has located a common law case in which an officer used a gun to apprehend a suspect. Cf. *post*, at 20 (discussing *Dickenson* v. *Watson*, Jones, T. 205, 84 Eng. Rep. 1218, 1218–1219 (K. B. 1682), in which a tax collector accidentally discharged hailshot into a passerby's eye). But the focus of the Fourth Amendment is "the privacy and security of individuals," not the particular manner of "arbitrary invasion[] by governmental officials." *Camara* v. *Municipal Court of City and County of San Francisco*, 387 U. S. 523, 528 (1967). As noted, our precedent protects "that degree of privacy against government that existed when the Fourth Amendment was adopted," *Kyllo* v. *United States*, 533 U. S. 27, 34 (2001)—a protection that extends to "[s]ubtler and more far-reaching means of invading privacy" adopted only later, *Olmstead* v. *United States*, 277 U. S. 438, 473 (1928) (Brandeis, J., dissenting). There is nothing subtle about a bullet, but the Fourth Amendment preserves personal security with respect to methods of apprehension old and new.

We stress, however, that the application of the common law rule does not transform every physical contact between a government employee and a member of the public into a Fourth Amendment seizure. A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify. See *County of Sacramento* v. *Lewis*, 523 U. S. 833, 844 (1998). Nor will force intentionally applied for some other purpose satisfy this rule. In this opinion, we consider only force used to apprehend. We do not accept the dissent's invitation to opine on matters not presented here—pepper

spray, flash-bang grenades, lasers, and more.  *Post*, at 23.

Moreover, the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context.  See *Nieves* v. *Bartlett*, 587 U. S. ___, ___ (2019) (slip op., at 10).  Only an objective test "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment."  *Michigan* v. *Chesternut*, 486 U. S. 567, 574 (1988).  While a mere touch can be enough for a seizure, the amount of force remains pertinent in assessing the objective intent to restrain.  A tap on the shoulder to get one's attention will rarely exhibit such an intent.  See *INS* v. *Delgado*, 466 U. S. 210, 220 (1984); *Jones*, 35 N. C., at 448–449.

Nor does the seizure depend on the subjective perceptions of the seized person.  Here, for example, Torres claims to have perceived the officers' actions as an attempted carjacking.  But the conduct of the officers—ordering Torres to stop and then shooting to restrain her movement—satisfies the objective test for a seizure, regardless whether Torres comprehended the governmental character of their actions.

The rule we announce today is narrow.  In addition to the requirement of intent to restrain, a seizure by force—absent submission—lasts only as long as the application of force.  That is to say that the Fourth Amendment does not recognize any "*continuing* arrest during the period of fugitivity." *Hodari D.*, 499 U. S., at 625.  The fleeting nature of some seizures by force undoubtedly may inform what damages a civil plaintiff may recover, and what evidence a criminal defendant may exclude from trial.  See, *e.g.*, *Utah* v. *Strieff*, 579 U. S. ___, ___ (2016) (slip op., at 4).  But brief seizures are seizures all the same.

Applying these principles to the facts viewed in the light most favorable to Torres, the officers' shooting applied

physical force to her body and objectively manifested an intent to restrain her from driving away. We therefore conclude that the officers seized Torres for the instant that the bullets struck her.

## III

In place of the rule that the application of force completes an arrest even if the arrestee eludes custody, the officers would introduce a single test for all types of seizures: intentional acquisition of control. This alternative rule is inconsistent with the history of the Fourth Amendment and our cases.

### A

The officers and their *amici* stress that common law rules are not automatically "elevated to constitutional proscriptions," *Hodari D.*, 499 U. S., at 626, n. 2, especially if they are "distorted almost beyond recognition when literally applied," *Garner*, 471 U. S., at 15. In their view, the common law doctrine recognized in *Hodari D.* is just "a narrow legal rule intended to govern liability in civil cases involving debtors." Brief for National Association of Counties et al. as *Amici Curiae* 12. The dissent presses the same argument. See *post*, at 14–17.

But the common law did not define the arrest of a debtor any differently from the arrest of a felon. Whether the arrest was authorized by a criminal indictment or a civil writ, "there must be a corporal seizing, or touching the defendant's person; or, what is tantamount, a power of taking immediate possession of the body, and the party's submission thereto, and a declaration of the officer that he makes an arrest." 1 J. Backus, A Digest of Laws Relating to the Offices and Duties of Sheriff, Coroner and Constable 115–116 (1812). Treatises on the law governing criminal arrests cited *Genner* v. *Sparks*, 6 Mod. 173, 87 Eng. Rep. 928—the preeminent mere-touch case involving a debtor—for the

proposition that, "[i]n making the arrest, the constable or party making it should actually seize or touch the offender's body, or otherwise restrain his liberty." 1 R. Burn, The Justice of the Peace 275 (28th ed. 1837). When English courts confronted arrests for criminal offenses, they too relied on precedents concerning arrests for civil offenses. See *Bridgett* v. *Coyney*, 1 Man. & Ryl. 1, 5–6 (K. B. 1827); *Arrowsmith* v. *Le Mesurier*, 2 Bos. & Pul. 211, 211–212, 127 Eng. Rep. 605, 606 (C. P. 1806). American courts likewise articulated a materially identical definition in criminal cases—that "[t]he arrest itself is the laying hands on the defendant," *State* v. *Townsend*, 5 Del. 487, 488 (Ct. Gen. Sess. 1854), or that an arrest is "the taking, seizing, or detaining of the person of another, either by touching him or putting hands on him," *McAdams* v. *State*, 30 Okla. Crim. 207, 210, 235 P. 241, 242 (1925).

This uniform definition also explains why an arrest by mere touch carried legal consequences in both the criminal and civil contexts. The point of an arrest was of course to take custody of a person to secure his appearance at a proceeding. But some arrests did not culminate in actual control of the individual, let alone a trip to the gaol or compter. See *Nicholl*, 2 Y. & J., at 403–404, 148 Eng. Rep., at 975–976. When an officer let an arrestee get away, the officer risked becoming a defendant himself in an action for "escape." See Perkins, The Law of Arrest, 25 Iowa L. Rev. 201, 204 (1940). The laying of hands constituted a taking custody and would expose the officer to liability for the escape of felons and debtors alike. See 1 M. Hale, Pleas of the Crown 590–591, 597, 603 (1736); 2 *id.*, at 93 (no liability for escape "if the felon were not once in the hands of an officer"); see also Perkins, 25 Iowa L. Rev., at 206.

The tort of false imprisonment, which the dissent rightly acknowledges as the "'closest analogy' to an arrest without probable cause," *post*, at 12 (quoting *Wallace* v. *Kato*, 549 U. S. 384, 388–389 (2007)), reinforces the conclusion that

the common law considered touching to be a seizure. Stated generally, false imprisonment required "confinement," such as "taking a person into custody under an asserted legal authority." Restatement of Torts §§35, 41 (1934); see 3 Blackstone 127. But that element of confinement demanded no more than that the defendant "had for one moment taken possession of the plaintiff's person"—including, "for example, if he had tapped her on the shoulder, and said, 'You are my prisoner.'" *Simpson* v. *Hill*, 1 Esp. 431, 431–432, 170 Eng. Rep. 409 (N. P. 1795); see Restatement of Torts §41, Comment *h* (noting that "the touching alone of the person against whom [legal authority] was asserted would be sufficient to constitute" confinement by arrest when the authority was valid). While the dissent emphasizes that "the court [in *Simpson*] proceeded to *reject* the plaintiff's claim for false imprisonment," *post*, at 13, that was only because "the constable never touched the plaintiff, or took her into custody." 1 Esp., at 431, 170 Eng. Rep., at 409.

To be sure, the mere-touch rule was particularly well documented in cases involving the execution of civil process. An officer pursuing a debtor could not forcibly enter the debtor's home unless the debtor had escaped arrest, such as by fleeing after being touched. See *Semayne's Case*, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 196 (K. B. 1604); see also *Miller* v. *United States*, 357 U. S. 301, 307 (1958). Officers seeking to execute criminal process, on the other hand, possessed greater pre-arrest authority to enter a felon's home. See *Payton*, 445 U. S., at 598. But the fact that the common law rules of arrest generated more litigation in the civil context proves only that creditors had ready recourse to the courts to pursue escape actions for unsatisfactory arrests. There is no reason to suspect that English jurists silently adopted a special definition of arrest only for debt collection—indeed, they told us just the opposite. See *supra*, at 12. Nothing specific to debt collection elevated escape from arrest into a justification for entry of the home. Whenever

a person was "lawfully arrested for *any* Cause and afterwards escape[d], and shelter[ed] himself in a House," the officer could break open the doors of the house. 2 W. Hawkins, Pleas of the Crown 87 (1721) (emphasis added).

In any event, the officers and the dissent misapprehend the history of the Fourth Amendment by minimizing the role of practices in civil cases. "[A]rrests in civil suits were still common in America" at the founding. *Long* v. *Ansell*, 293 U. S. 76, 83 (1934). And questions regarding the legality of an arrest "typically arose in civil damages actions for trespass or false arrest." *Payton*, 445 U. S., at 592. Accordingly, this Court has not hesitated to rely on such decisions when interpreting the Fourth Amendment. See, *e.g.*, *United States* v. *Jones*, 565 U. S. 400, 404–405 (2012); *Boyd* v. *United States*, 116 U. S. 616, 626 (1886). We see no reason to break with our settled approach in this case.

B

The officers and the dissent derive from our cases a different touchstone for the seizure of a person: "an intentional acquisition of physical control." *Brower* v. *County of Inyo*, 489 U. S. 593, 596 (1989). Under their alternative rule, the use of force becomes a seizure "only when there is a governmental termination of freedom of movement through means intentionally applied." *Id.*, at 597 (emphasis deleted); see Brief for Respondents 12–15; *post*, at 6–7.

This approach improperly erases the distinction between seizures by *control* and seizures by *force*. In all fairness, we too have not always been attentive to this distinction when a case did not implicate the issue. See, *e.g.*, *Brendlin* v. *California*, 551 U. S. 249, 254 (2007). But each type of seizure enjoys a separate common law pedigree that gives rise to a separate rule. See *Hodari D.*, 499 U. S., at 624–625; A. Cornelius, The Law of Search and Seizure §47, pp. 163–164 (2d ed. 1930) (contrasting actual control with "constructive detention" by touching).

Unlike a seizure by force, a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement. A prime example of the latter comes from *Brower*, where the police seized a driver when he crashed into their roadblock. 489 U. S., at 598–599; see also, *e.g.*, *Scott* v. *Harris*, 550 U. S. 372, 385 (2007) (ramming car off road); *Williams* v. *Jones*, Cas. t. Hard. 299, 301, 95 Eng. Rep. 193, 194 (K. B. 1736) (locking person in room). Under the common law rules of arrest, actual control is a necessary element for this type of seizure. See Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 553 (1924). Such a seizure requires that "a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Brower*, 489 U. S., at 599. But that requirement of control or submission never extended to seizures by force. See, *e.g.*, *Sandon*, El. Bl. & El., at 940–941, 120 Eng. Rep., at 760.

As common law courts recognized, any such requirement of control would be difficult to apply in cases involving the application of force. See *supra*, at 7. At the most basic level, it will often be unclear when an officer succeeds in gaining control over a struggling suspect. Courts will puzzle over whether an officer exercises control when he grabs a suspect, when he tackles him, or only when he slaps on the cuffs. Neither the officers nor the dissent explains how long the control must be maintained—only for a moment, into the squad car, or all the way to the station house. To cite another example, counsel for the officers speculated that the shooting would have been a seizure if Torres stopped "maybe 50 feet" or "half a block" from the scene of the shooting to allow the officers to promptly acquire control. Tr. of Oral Arg. 45. None of this squares with our recognition that "'[a] seizure is a single act, and not a continuous fact.'" *Hodari D.*, 499 U. S., at 625 (quoting *Thompson* v. *Whitman*, 18 Wall. 457, 471 (1874)). For centuries, the common law

rule has avoided such line-drawing problems by clearly fixing the moment of the seizure.

## IV

The dissent sees things differently. It insists that the term "seizure" has always entailed a taking of possession, whether the officer is seizing a person, a ship, or a promissory note. See *post*, at 6–7. But the facts of the cases and the language of the opinions confirm that the concept of possession included the "constructive detention" of persons "never actually brought within the physical control of the party making an arrest." Wilgus, 22 Mich. L. Rev., at 556 (emphasis deleted); see, *e.g.*, *Nicholl*, 2 Y. & J., at 404, 148 Eng. Rep., at 976 (explaining that the "slightest touch" can constitute "custody"); *Anonymus*, 1 Vent., at 306, 86 Eng. Rep., at 197 (describing a touch as a "taking" of a person). Even the dissent acknowledges that a touch can establish a form of constructive possession. See *post*, at 20.

The dissent says that "common law courts never contemplated" that the touching itself could effect a seizure. *Post,* at 18. But one need only look at the many decisions adopting that definition of arrest. See *supra*, at 5–8, 12–13. The dissent can offer no case expressing doubt about the rule that the touching constitutes an arrest, much less refusing to apply that rule in any context—felon or debtor. And we have, as noted, definitively stated that "the arrest of a person is quintessentially a seizure." *Payton*, 445 U. S., at 585 (internal quotation marks omitted). The dissent's attempt to ignore arrests it appraises as "unfortunate" or "peculiar," *post*, at 15, 16, pays insufficient regard to the complete history underlying the Fourth Amendment.

The dissent argues that we advance a "schizophrenic reading of the word 'seizure.'" *Post*, at 7. But our cases demonstrate the unremarkable proposition that the nature of a seizure can depend on the nature of the object being seized. It is not surprising that the concept of constructive

detention or the mere-touch rule developed in the context of seizures of a person—capable of fleeing and with an interest in doing so—rather than seizures of "houses, papers, and effects."

The dissent also criticizes us for "posit[ing] penumbras" of "privacy" and "personal security" in our analysis of the Fourth Amendment. *Post*, at 24. But the *text* of the Fourth Amendment expressly guarantees the "right of the people to be *secure* in their *persons*," and our earliest precedents recognized privacy as the "essence" of the Amendment—not some penumbral emanation. *Boyd*, 116 U. S., at 630. We have relied on that understanding in construing the meaning of the Amendment. See, *e.g.*, *Riley* v. *California*, 573 U. S. 373, 403 (2014).

The dissent speculates that the real reason for today's decision is an "impulse" to provide relief to Torres, *post*, at 23, or maybe a desire "to make life easier for ourselves," *post*, at 22. It may even be, says the dissent, that the Court "at least hopes to be seen as trying" to achieve particular goals. *Post*, at 25. There is no call for such surmise. At the end of the day we simply agree with the analysis of the common law of arrest and its relation to the Fourth Amendment set forth thirty years ago by Justice Scalia, joined by six of his colleagues, rather than the competing view urged by the dissent today.

\*     \*     \*

We hold that the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued. Of course, a seizure is just the first step in the analysis. The Fourth Amendment does not forbid all or even most seizures—only unreasonable ones. All we decide today is that the officers seized Torres by shooting her with intent to restrain her movement. We leave open on remand any questions regarding the reasonableness of the seizure, the damages

caused by the seizure, and the officers' entitlement to qual-
ified immunity.

The judgment of the Court of Appeals is vacated, and the
case is remanded for further proceedings consistent with
this opinion.

*It is so ordered.*

JUSTICE BARRETT took no part in the consideration or de-
cision of this case.

# SUPREME COURT OF THE UNITED STATES

<hr>

No. 19–292

<hr>

## ROXANNE TORRES, PETITIONER *v.* JANICE MADRID, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[March 25, 2021]

JUSTICE GORSUCH, with whom JUSTICE THOMAS and JUSTICE ALITO join, dissenting.

The majority holds that a criminal suspect can be simultaneously seized and roaming at large. On the majority's account, a Fourth Amendment "seizure" takes place whenever an officer "merely touches" a suspect. It's a seizure even if the suspect refuses to stop, evades capture, and rides off into the sunset never to be seen again. That view is as mistaken as it is novel.

Until today, a Fourth Amendment "seizure" has required taking possession of someone or something. To reach its contrary judgment, the majority must conflate a seizure with its attempt and confuse an arrest with a battery. In the process, too, the majority must disregard the Constitution's original and ordinary meaning, dispense with our conventional interpretive rules, and bypass the main currents of the common law. Unable to rely on any of these traditional sources of authority, the majority is left to lean on (really, repurpose) an abusive and long-abandoned English debt-collection practice. But there is a reason why, in two centuries filled with litigation over the Fourth Amendment's meaning, this Court has never before adopted the majority's definition of a "seizure." Neither the Constitution nor common sense can sustain it.

# I

## A

This case began when two Albuquerque police officers approached Roxanne Torres on foot. The officers thought Ms. Torres was the subject of an arrest warrant and suspected of involvement in murder and drug trafficking. As it turned out, they had the wrong person; Ms. Torres was the subject of a *different* arrest warrant. As she saw the officers walk toward her, Ms. Torres responded by getting into her car and hitting the gas. At the time, Ms. Torres admits, she was "tripping out bad" on methamphetamine. Fearing the oncoming car was about to hit them, the officers fired their duty weapons, and two bullets struck Ms. Torres while others hit her car.

None of that stopped Ms. Torres. She continued driving—over a curb, across some landscaping, and into a street, eventually colliding with another vehicle. Abandoning her car, she promptly stole a different one parked nearby. Ms. Torres then drove over 75 miles to another city. When she eventually sought medical treatment, doctors decided she needed to be airlifted back to Albuquerque for more intensive care. Only at that point, a day after her encounter with the officers, was Ms. Torres finally identified and arrested. Ultimately, she pleaded no contest to assault on a police officer, aggravated fleeing from an officer, and the unlawful taking of a motor vehicle.

More than two years later, Ms. Torres sued the officers for damages in federal court under 42 U. S. C. §1983. She alleged that they had violated the Fourth Amendment by unreasonably "seizing" her. After discovery, the officers moved for summary judgment. The district court granted the motion, and the court of appeals affirmed. Individuals like Ms. Torres are free to sue officers under New Mexico state law for assault or battery. They may also sue officers under the Fourteenth Amendment for conduct that "shocks the conscience." But under longstanding circuit precedent,

the courts explained, a Fourth Amendment "seizure" occurs only when the government obtains "physical control" over a person or object. Because Ms. Torres "managed to elude the police for at least a full day after being shot," the courts reasoned, the officers' bullets had not "seized" her; any seizure took place only when she was finally arrested back in Albuquerque the following day. *Torres* v. *Madrid*, 769 Fed. Appx. 654, 657 (CA10 2019).

B

Now before us, Ms. Torres argues that this Court's decision in *California* v. *Hodari D.*, 499 U. S. 621 (1991), "compel[s] reversal." Brief for Petitioner 25. As she reads it, *Hodari D.* held that a Fourth Amendment seizure takes place whenever an officer shoots or even "mere[ly] touch[es]" an individual with the intent to restrain. Brief for Petitioner 15.

Whatever one thinks of Ms. Torres's argument, one thing is certain: *Hodari D.* has generated considerable confusion. There, officers chased a suspect on foot. 499 U. S., at 623. Later, the suspect argued that he was "seized" for purposes of the Fourth Amendment the moment the chase began. See *id.*, at 625. Though *he* fled, the suspect argued, a "reasonable person" would not have felt at liberty given the officers' "show of authority," so a Fourth Amendment seizure had occurred. *Id.*, at 627–628.

The Court rejected this argument. In doing so, it explained that, "[f]rom the time of the founding to the present, the word 'seizure' has meant a 'taking possession.'" *Id.*, at 624. Because the defendant did not submit to the officers' show of authority, the Court reasoned, the officers' conduct amounted at most to an attempted seizure. See *id.*, at 626, and n. 2. And "neither usage nor common-law tradition makes an *attempted* seizure a seizure." *Ibid.*

At the same time, and as Ms. Torres emphasizes, the

Court didn't end its discussion there. It proceeded to imagine a different and hypothetical case, one in which the officers not only chased the suspect but also "appl[ied] physical force" to him. In these circumstances, the Court suggested, "merely touching" a suspect, even when officers fail to gain possession, might qualify as a seizure. *Id.*, at 624–625.

Unsurprisingly, these dueling passages in *Hodari D.* led to a circuit split. For the first time, some lower courts began holding that a "mere touch" constitutes a Fourth Amendment "seizure." Others, however, continued to adhere to the view, taken "[f]rom the time of the founding to the present," that the word "seizure" means "taking possession." *Id.*, at 624 (internal quotation marks omitted). We took this case to sort out the confusion.

## II

As an initial matter, Ms. Torres is mistaken that *Hodari D.*'s discussion of "mere touch" seizures compels a ruling in her favor. Under the doctrine of *stare decisis*, we normally afford prior holdings of this Court considerable respect. But, in the course of issuing their holdings, judges sometimes include a "witty opening paragraph, the background information on how the law developed," or "digressions speculating on how similar hypothetical cases might be resolved." B. Garner et al., The Law of Judicial Precedent 44 (2016). Such asides are dicta. The label is hardly an epithet: "Dicta may afford litigants the benefit of a fuller understanding of the court's decisional path or related areas of concern." *Id.*, at 65. Dicta can also "be a source of advice to successors." *Ibid.* But whatever utility it may have, dicta cannot bind future courts.

This ancient rule serves important purposes. A passage unnecessary to the outcome may not be fully considered. Parties with little at stake in a hypothetical question may afford it little or no adversarial testing. And, of course, federal courts possess no authority to issue rulings beyond the

cases and controversies before them. If the respect we afford past holdings under the doctrine of *stare decisis* may be justified in part as an act of judicial humility, respecting that doctrine's limits must be too. Fewer things could be less humble than insisting our every passing surmise constitutes a rule forever binding a Nation of over 300 million people. No judge can see around every corner, predict the future, or fairly resolve matters not at issue. See, *e.g.*, *Cohens* v. *Virginia*, 6 Wheat. 264, 399–400 (1821); *Central Va. Community College* v. *Katz*, 546 U. S. 356, 363 (2006).

On any account, the passage in *Hodari D.* Ms. Torres seeks to invoke was dicta. The only question presented in that case was whether officers seize a defendant by a show of authority *without* touching him. The Court answered that question in the negative. The separate question whether a "mere touch" *also* qualifies as a seizure was not presented by facts of the case. No party briefed the issue. And the opinion offered the matter only shallow consideration, resting on just three sources: A state court opinion from the 1860s, a "comment" in the 1934 Restatement of Torts, and a 1930s legal treatise. See 499 U. S., at 624–625.

Already some lower courts, including those below, have recognized that *Hodari D.*'s aside does not constitute a binding holding. See *Brooks* v. *Gaenzle*, 614 F. 3d 1213, 1220–1221 (CA10 2010); *Henson* v. *United States*, 55 A. 3d 859, 864–865 (D. C. 2012). Today's majority seems to accept the point too. It acknowledges that *Hodari D.* "principally concerned a show of authority." *Ante*, at 4. And it says it intends to rule for Ms. Torres "independently" of *Hodari D. Ante*, at 4.

### III

Seeking to carry that burden, the majority picks up where *Hodari D.*'s dicta left off. It contends that an officer "seizes" a person by merely touching him with an "intent to restrain." *Ante*, at 9. We are told that a touch is a seizure

even if the suspect never stops or slows down; it's a seizure
even if he evades capture.  In all the years before *Hodari
D.*'s dicta, this conclusion would have sounded more than a
little improbable to most lawyers and judges—as it should
still today.  A mere touch may be a battery.  It may even be
part of an attempted seizure.  But the Fourth Amendment's
text, its history, and our precedent all confirm that "seizing"
something doesn't mean touching it; it means taking pos-
session.

## A

Start with the text.  The Fourth Amendment guarantees
that "[t]he right of the people to be secure in their persons,
houses, papers, and effects, against unreasonable searches
and seizures, shall not be violated."  As at least part of *Ho-
dari D.* recognized, "[f]rom the time of the founding to the
present," the key term here—"seizure"—has always meant
"'taking possession.'"  499 U. S., at 624.

Countless contemporary dictionaries define a "seizure" or
the act of "seizing" in terms of possession.[1]  This Court's
early cases reflect the same understanding.  Just sixteen

---

[1] N. Bailey, Universal Etymological English Dictionary (22 ed. 1770)
(To seize is "to take into Custody or Possession by Force, or wrongfully;
to distrain, to attack, to lay hold of, or catch"; a seizure is a "seizing, tak-
ing into Custody"); T. Dyche & W. Pardon, A New General English Dic-
tionary (14th ed. 1771) (To seize is "to lay or take hold of violently or at
unawares, wrongfully, or by force"; a seizing or seizure is "a taking pos-
session of any thing by violent, force, &c"); 2 S. Johnson, A Dictionary of
the English Language (6th ed. 1785) (To seize is "1. To take hold of; to
gripe; to grasp." "2. To take possession of by force." "3. To take possession
of; to lay hold on; to invade suddenly." "4. To take forcible possession of
by law." "5. To make possessed; to put in possession of." A seizure is "1.
The act of seizing." "2. The thing seized." "3. The act of taking forcible
possession." "4. Gripe; possession." "5. Catch"); 2 J. Ash, The New and
Complete Dictionary of the English Language (2d ed. 1795) (To seize is
"[t]o grasp, to lay hold on, to fasten on, to take possession of, to take pos-
session by law"; a seizure is "[t]he act of seizing, a gripe, a catch; the act
of taking possession by force of law; the thing seized, the thing pos-
sessed").

years after the Fourth Amendment's adoption, Congress passed a statute regulating the "seizure" of ships. See *The Josefa Segunda*, 10 Wheat. 312, 322 (1825). This Court interpreted the term to require "an open, visible possession claimed," so that those previously possessing the ship "understand that they are dispossessed, and that they are no longer at liberty to exercise any dominion on board of the ship." *Id.*, at 325. Nor did the Court's view change over time. In *Pelham* v. *Rose*, 9 Wall. 103, 106 (1870), the Court likewise explained that "[t]o effect [a] seizure" of something, one needed "to take" the thing "into his actual custody and control." *Id.*, at 107.

Today's majority disputes none of this. It accepts that a seizure of the inanimate objects mentioned in the Fourth Amendment (houses, papers, and effects) requires possession. *Ante*, at 4. And when it comes to persons, the majority agrees (as *Hodari D.* held) that a seizure in response to a "show of authority" takes place if and when the suspect submits to an officer's possession. *Ante*, at 15. The majority insists that a different rule should apply *only* in cases where an officer "touches" the suspect. Here—and here alone—possession is not required. So, under the majority's logic, we are quite literally asked to believe the officers in this case "seized" Ms. Torres's person, but *not* her car, when they shot both and both continued speeding down the highway.

The majority's need to resort to such a schizophrenic reading of the word "seizure" should be a signal that something has gone seriously wrong. The Fourth Amendment's Search and Seizure Clause uses the word "seizures" once in connection with four objects (persons, houses, papers, and effects). The text thus suggests parity, not disparity, in meaning. It is close to canon that when a provision uses the same word multiple times, courts must give it the same meaning each time. *Ratzlaf* v. *United States*, 510 U. S. 135, 143 (1994). And it *is* canonical that courts cannot give a

single word different meanings depending on the happen-
stance of "which object it is modifying." *Reno* v. *Bossier Par-
ish School Bd.*, 528 U. S. 320, 329 (2000) ("[W]e refuse to
adopt a construction that would attribute different mean-
ings to the same phrase in the same sentence, depending on
which object it is modifying"). To "[a]scrib[e] various mean-
ings" to a single word, we have observed, is to "render mean-
ing so malleable" that written laws risk "becom[ing] suscep-
tible to individuated interpretation." *Ratzlaf*, 510 U. S., at
143 (internal quotation marks omitted). The majority's con-
clusion that a single use of the word "seizures" bears two
different meanings at the same time—indeed, in this very
case—is truly novel. And when it comes to construing the
Constitution, that kind of innovation is no virtue.

   If more textual evidence were needed, the Fourth Amend-
ment's neighboring Warrant Clause would seem to provide
it. That Clause states that warrants must describe "the
persons or things to be seized." Once more, the Amendment
uses the same verb—"seized"—for both persons and objects.
Once more, it suggests parity, not some hidden divergence
between people and their possessions. Nor does anyone dis-
pute that a warrant for the "seizure" of a person means a
warrant authorizing officers to take that person into their
*possession*.

   Against all these adverse textual clues, the majority of-
fers little in reply. It *admits* that its interpretation defies
this Court's teachings in *Ratzlaf* and *Reno* by ascribing dif-
ferent meanings to the word "seizure" depending on "the ob-
ject being seized." *Ante*, at 16. It says only that we should
overlook the problem because "our cases" in the Fourth
Amendment context compel this remarkable construction.
*Ibid.* But it is unclear what cases the majority might have
in mind for it cites none.

   Instead, the majority proceeds to reason that the word
"seizure" *must* carry a different meaning for persons and
objects because persons alone are "capable of fleeing" and

have "an interest in doing so." *Ibid.* But that reasoning faces trouble even from *Hodari D.*, which explained that "[a] ship still fleeing, even though under attack, would not be considered to have been seized as a war prize." 499 U. S., at 624. Of course, as the majority observes, persons alone can possess "an interest" in fleeing. But, as *Hodari D.*'s example shows, they can have as much (or more) interest in fleeing to prevent the seizure of their possessions as they do their persons. Even today, a suspect driving a car loaded with illegal drugs may be more interested in fleeing to avoid the loss of her valuable cargo than to prevent her own detention. Yet the majority offers no reasoned explanation why the meaning of the word "seizure" changes when officers hit the suspect and when they hit her drugs and car as all three speed away.

Unable to muster any precedent or sound reason for its reading, the majority finishes its textual analysis with a selective snippet from Webster's Dictionary and a hypothetical about a purse snatching. The majority notes that Webster equated a seizure with "'the act of taking by warrant'" or "'laying hold on suddenly.'" *Ante*, at 4. But Webster used the warrant definition to describe "the seizure of contraband goods"—a seizure the majority *agrees* requires possession. Meanwhile, the phrase "laying hold on" a person connotes physical possession, as a look at the dictionary's entire definition demonstrates. A "seizure," Webster continued, is the "act of taking possession by force," the "act of taking by warrant," "possession," and "a catching."[2] Read

_____

[2] 2 N. Webster, An American Dictionary of the English Language 67 (1828) (To seize is "1. To fall or rush upon suddenly and lay hold on; or to gripe or grasp suddenly." "2. To take possession by force, with or without right." "3. To invade suddenly; to take hold of; to come upon suddenly; as, a fever *seizes* a patient." "4. To take possession by virtue of a warrant or legal authority." To be seized is to be "[s]uddenly caught or grasped; taken by force; invaded suddenly; taken possession of; fastened with a cord; having possession." A seizure is "1. The act of seizing; the act of laying hold on suddenly; as the *seizure* of a thief. 2. The act of taking

in full, Webster thus lends no support to the majority's view.

The purse hypothetical, borrowed from *Hodari D.*'s dicta, turns out to be even less illuminating. It supposes that "an ordinary user of the English language could remark: 'She seized the purse-snatcher, but he broke out of her grasp.'" *Ante*, at 5 (quoting *Hodari D.*, 499 U. S., at 626). But what does that prove? The hypothetical contemplates a woman who *takes possession* of the purse-snatcher, establishing a "grasp" for him to "break out of." One doesn't "break out of" a mere touch.

Really, the majority's answer to the Constitution's text is to ignore it. The majority stands mute before the consensus among founding-era dictionaries, this Court's early cases interpreting the word "seizure," and the Warrant Clause. It admits its interpretation spurns the canonical interpretive principle that a single word in a legal text does not change its meaning depending on what object it modifies. All we're offered is a curated snippet and an unhelpful hypothetical. Ultimately, it's hard not to wonder whether the majority says so little about the Constitution's terms because so little can be said that might support its ruling.

B

Rather than focus on text, the majority turns quickly to history. At common law, it insists, a "linkage" existed between the "seizure" of a person and the concept of an "arrest." *Ante*, at 5. Thus, the majority contends, we must examine how the common law defined *that* term. But following the majority down this path only leads to another dead end. Unsurprisingly, an "arrest" at common law ordinarily required possession too.

––––––––––

possession by force; as the *seizure* of lands or goods; the *seizure* of a town by an enemy; the *seizure* of a throne by an usurper. 3. The act of taking by warrant; as the *seizure* of contraband goods. 4. The thing taken or seized." "5. Gripe; grasp; possession." "6. Catch; a catching").

1

Consider what some of our usual common law guides say on the subject. Blackstone defined "an arrest" in the criminal context as "the apprehending or restraining of one's person, in order to be forthcoming to answer an alleged or suspected crime." 4 Commentaries on the Laws of England 286 (1769). Hale and Hawkins both equated an "arrest" with "apprehending," "taking," and "detain[ing]" a person. See 1 M. Hale, Pleas of the Crown 89, 93–94 (5th ed. 1716); 2 W. Hawkins, Pleas of the Crown 74–75, 77, 80–81, 86 (3d ed. 1739). And Hawkins stated that an arrest required the officer to "actually have" the suspect "in his Custody." *Id.*, at 129. Any number of historical dictionaries attest to a similar understanding—defining an "arrest" as a "stop," a "taking of a person," and the act "by which a man becomes a prisoner."[3]

Common law causes of action point to the same common-sense conclusion. During the founding era, an individual who was unlawfully arrested could seek redress through the tort of false imprisonment. See 3 W. Blackstone, Commentaries on the Laws of England 127 (1768); see also *Payton* v. *New York*, 445 U. S. 573, 592 (1980); *Wallace* v. *Kato*,

––––––––––

[3] See, *e.g.*, Bailey, Universal Etymological English Dictionary (To arrest is "to stop or stay"; an arrest (in the legal sense) is "a Legal taking of a Person, and restraining him from Liberty"); Dyche & Pardon, A New General English Dictionary (An arrest is "the stopping or detaining a person, by a legal process"); 1 Johnson, A Dictionary of the English Language ("1. In law. A stop or stay; as, a man apprehended for debt, is said to be arrested." "An arrest is a certain restraint of a man's person, depriving him of his own will, and binding it to become obedient to the will of the law, and may be called the beginning of imprisonment." "2. Any caption, seizure of the person." "3. A stop" (emphasis deleted)); 1 Ash, The New and Complete Dictionary of the English Language (To arrest is "[t]o seize a man for debt, to apprehend by virtue of a writ from any court of justice, to stop, to hinder"; an arrest is "[t]he act of seizing on a man's person for debt, the execution of a writ from any court of justice by which a man becomes a prisoner, a stop, a hindrance").

549 U. S. 384, 388–389 (2007) (describing "false arrest and false imprisonment" as the "closest analogy" to an arrest without probable cause). That cause of action aimed to remedy "the violation of the right of personal liberty," 3 Blackstone, *supra*, at 127, which was "the power of loco-motion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct," 1 W. Blackstone, Commentaries on the Laws of England 130 (1765). Thus, false imprisonment—the violation of the right to move where one desired—required proof of "[t]he detention of the person" and "[t]he unlawfulness of such detention." 3 Blackstone, *supra*, at 127. That detention could occur "in a gaol, house, stocks, or in the street," but it occurred only if a person was "*under the custody* of another." 1 E. East, Pleas of the Crown 428 (1806) (emphasis added).

Much the same held true in another related field. At common law, an officer could be held criminally liable for allowing an individual to escape after being arrested. And to prove the existence of an arrest in an "Indictment for an Escape," a prosecutor had to "expressly shew" that "the Party was actually in the *Defendant's Custody* for a Crime, Action, or Commitment for it." 2 Hawkins, *supra*, at 132 (emphasis added). In other words, to demonstrate an arrest, a prosecutor had to prove the suspect had been "a Prisoner *in [the officer's] Custody*." 1 Hale, *supra*, at 112 (emphasis added). Here, too, an arrest required possession.

Once more, the majority's primary answer to all this countervailing evidence is to ignore it. And once more, the majority's own sources do more to hurt than help its cause. Lifting a line from *Simpson* v. *Hill*, 1 Esp. 431, 170 Eng. Rep. 409 (N. P. 1795), the majority suggests that the tort of false imprisonment at common law required no more than a "tapping on the shoulder." *Ante*, at 13 (citing 1 Esp., at 431–432, 170 Eng. Rep., at 409). But *Simpson* could not have stated the possession requirement more plainly: "[W]ithout any *taking possession* of the person," there "is

not, by law, a false imprisonment." *Id.*, at 432, 170 Eng. Rep., at 409 (emphasis added). And the court proceeded to *reject* the plaintiff's claim for false imprisonment because the "constable did never take her *into custody*." *Ibid.* (emphasis added). The majority offers no case finding the elements of false imprisonment satisfied by the mere touch of a fleeing person.

What remains of the majority's response follows the same course. The majority asserts that claims for escape only required proof that the officer touched a suspect. *Ante*, at 12. But to prove its point, the majority quotes a sentence from Hale stating that *no* liability for escape exists "'if the felon were not once in the hands of an officer.'" *Ibid.* (quoting 2 Pleas of the Crown 93 (1736)). And as Hale proceeded to make plain, a felon "in the hands of an officer" was another way of saying the officer had "apprehended" or "taken" the felon into his "custody." See *id.*, at 89, 93–94 (5th ed. 1716).

Ultimately, the majority seeks to invoke Samuel Johnson's dictionary and *Payton*, 445 U. S., at 585, to confirm only the anodyne point that some sort of "linkage" existed at common law between the concepts of "arrests" and "seizures." *Ante*, at 5. Yet, even here it turns out there is more to the story. The majority neglects to mention that Johnson proceeded to define an "arrest" as a "caption" of the person, "a stop or stay," a "restraint of a man's person, depriving him of his own will," and "the beginning of imprisonment." 1 S. Johnson, A Dictionary of the English Language (6th ed. 1785). "To arrest," Johnson said, was "[t]o seize," "to detain by power," "[t]o withhold; to hinder," and "[t]o stop motion." *Ibid.* Meanwhile, the sentence fragment the majority quotes from *Payton* turns out to have originated in Justice Powell's concurrence in *United States* v. *Watson*, 423 U. S. 411, 428 (1976). And looking to that sentence in full, it is plain Justice Powell, too, understood an arrest not as a touching, but as "the taking hold of one's person." *Ibid.*

Thus, even the majority's best sources only wind up point-ing us back to the traditional possession rule.

2

Unable to identify anything helpful in the main current of the common law, the majority is forced to retreat to an obscure eddy. Starting from *Hodari D.*'s three references to "mere touch" arrests, the majority traces these authorities back to their English origins. The tale that unfolds is a cu-rious one.

Before bankruptcy reforms in the 19th century, creditors seeking to induce repayment of their loans could employ bailiffs to civilly arrest delinquent debtors and haul them off to debtors prison. See Cohen, The History of Imprison-ment for Debt and Its Relation to the Development of Dis-charge in Bankruptcy, 3 J. Legal Hist. 153, 154–155 (1982). But the common law also offered debtors some tools to avoid or delay that fate. Relevant here, the common law treated the home as a "castle of defence and asylum" so no bailiff could break into a debtor's home to effect a civil arrest. 3 Blackstone, *supra*, at 288; see also Treiman, Escaping the Creditor in the Middle Ages, 43 L. Q. Rev. 230, 233 (1927). Over time, the practice of "keeping house" became an in-creasingly popular way for debtors to evade the bailiff. *Id.*, at 234. Naturally, too, creditors railed against this "notori-ous" practice. See *ibid.* And eventually Parliament re-sponded to their clamor. The English bankruptcy statutes of 1542 and 1570 imposed serious penalties on debtors who "kept house" to avoid imprisonment. Cohen, *supra*, at 157.

It was seemingly against this backdrop that the strange cases *Hodari D.*'s dicta briefly alluded to and the majority has now dug up began to appear. Under their terms, a bail-iff who could manage to touch a person hiding in his home, often through an open window or door, was deemed to have effected a civil "arrest." See *Genner* v. *Sparks*, 6 Mod. 173, 87 Eng. Rep. 928 (K. B. 1704). And because this mere touch

was deemed an "arrest," the bailiff was then permitted by law to proceed to "br[eak] the house . . . to seize upon" the person and render him to prison. *Ibid.*, 87 Eng. Rep., at 929. Of course it was farcical to call a tap through an open window an "arrest." But it proved a useful farce, at least for creditors.

One of the majority's lead cases, *Sandon* v. *Jervis*, El. Bl. & El. 935, 120 Eng. Rep. 758 (K. B. 1858), illustrates the absurdity of it all. There, a bailiff tried and failed "on several occasions" to arrest a debtor. *Id.*, at 936, 120 Eng. Rep., at 758. Eventually, the bailiff spotted an open window on "an upper story," so he ordered an assistant to fetch a ladder. *Ibid.* But the debtor and his daughter noticed the ploy and "ran to the window," slamming it closed. *Ibid.* Unfortunately, in the excitement a window pane broke. Seeing the opportunity, the bailiff's assistant, while perched atop the ladder, thrust his hand through the opening and managed to touch the debtor. *Id.*, at 936–937, 120 Eng. Rep., at 758. According to the court, this "arrest" was sufficient to justify the bailiff's later forcible entry into the home. *Id.*, at 946–948, 120 Eng. Rep., at 762–763.

By everyone's account, however, the farce extended only so far. Yes, the mere-touch arrest was a feature of civil bankruptcy practice for an unfortunate period. But the majority has not identified a *single* founding-era case extending the mere-touch arrest rule to the criminal context. The majority points to two nineteenth-century treatises, but both reference only a case about a debt-collection arrest. See *ante*, at 11–12 (citing 1 J. Backus, A Digest of Laws Relating to the Offices and Duties of Sheriff, Coroner and Constable 115–116, n. (c) (1812) (citing *Genner* v. *Sparks*, 6 Mod. 173, 87 Eng. Rep. 928 (K. B. 1704)), and 1 R. Burn, The Justice of the Peace 275 (28th ed. 1837) (citing the same)). The majority nods to dicta from an 1854 Delaware state trial court, but that came long after the founding and the majority does not explain how it sheds light on the

Fourth Amendment's original meaning. See *ante*, at 12 (citing *State* v. *Townsend*, 5 Del. 487, 488)). And every remaining early American case the majority cites for its "mere touch" rule—from the founding through the Civil War—involved only civil debt-collection arrests. See *ante*, at 4 (citing *Whithead* v. *Keyes*, 85 Mass. 495 (1862)); *ante*, at 6 (citing *United States* v. *Benner*, 24 F. Cas. 1084 (No. 14,568) (CC ED Pa. 1830)); *ante*, at 6 (citing *Butler* v. *Washburn*, 25 N. H. 251 (1852) (tax collection)). The same goes for the majority's primary English authorities. See *ante*, at 7 (citing *Nicholl* v. *Darley*, 2 Y. & J. 399, 400, 148 Eng. Rep. 974 (Exch. 1828); *Sandon*, El. Bl. & El., at 940, 120 Eng. Rep., at 760)).

So what relevance do these obscure and long-abandoned civil debt-collection practices have for today's case concerning a criminal arrest and brought under the Fourth Amendment? The answer seems to be not much, for at least three reasons.

In the first place, the Amendment speaks of "seizures," not "arrests." To the extent the common law of arrests informs the Amendment's meaning, we have already seen that an arrest normally meant taking possession of an arrestee. Maybe in one peculiar area, and for less than admirable reasons, the common law deviated from this understanding. But this Court usually presumes that those who wrote the Constitution used words in their ordinary sense, not in some idiosyncratic way. See *District of Columbia* v. *Heller*, 554 U. S. 570, 576 (2008). And today's majority supplies no evidence that anyone during the founding era understood the Fourth Amendment to adopt the specialized definition of "arrest" from civil debt-collection practice.

Second, even if we were to hypothesize that people *did* understand the Fourth Amendment to incorporate this quirky rule, what would that tell us? Here, the officers tried to arrest Ms. Torres in a parking lot on behalf of the State for serious crimes, not break into her home on behalf of the

local credit union for missing a payment. So even if we were willing to suppose that the founding generation understood the Constitution to incorporate the majority's civil debt-collection arrest rule, nothing before us suggests they contemplated, let alone endorsed, injecting it into the criminal law and overriding settled doctrine equating arrests with possession.

Finally, even in the civil debt-collection context, the majority cannot point to even a single case suggesting that hitting a suspect with an object—an arrow, a bullet, a cudgel, *anything*—as she flees amounted to an arrest. Instead, the majority's cases hold only that the "laying of hands" on an arrestee constituted an arrest. *Ante*, at 7. Thus, even if the Fourth Amendment did transpose the "mere touch" rule from the context of civil arrests into the criminal arena, it *still* would not reach this case.

How does the majority respond? Again, it does little more than disregard the difficulties. The majority says there is "no reason to suspect" the common law defined criminal arrests of felons "any differently" than civil arrests of debtors. *Ante*, at 13, 11. But the majority skips over all the evidence canvassed above showing that a criminal arrest required possession, not a mere touch. See Part III–B–1, *supra*. It sails past its failure to identify *any* case holding that a mere touch qualified as a criminal arrest. It ignores the fact Blackstone defined criminal and civil arrests differently.[4] And it claims to find support in Hawkins's statement that an officer could break into a house to capture an arrestee

——————
[4] The majority cites only Blackstone's definition of a civil arrest, which required a "corporal seising or touching the defendant's body." *Ante*, at 6 (quoting 3 W. Blackstone, Commentaries on the Laws of England 288 (1768)). But flipping from Blackstone's third volume (discussing "private wrongs") to his fourth volume (discussing "public wrongs") reveals—as we have already seen but the majority fails to acknowledge—that Blackstone equated a criminal arrest with "apprehending or restraining . . . one's person, in order to be forthcoming to answer an alleged or suspected crime." See *supra*, at 11.

who escaped after being "'lawfully arrested for *any* Cause.'" *Ante*, at 13–14 (quoting 2 Pleas of the Crown 87 (1721)). Yet, the question before us isn't what an officer might do *after* making an arrest; it's what constitutes an arrest *in the first place*.

Rather than confront shortcomings like these, the majority asks us to glide past them. It suggests that importing the mere-touch rule into the criminal context is permissible because "no common law case" had occasion to reject that idea expressly. See *ante*, at 16. But this gets things backwards. Today, for the first time, the majority seeks to equate seizures and criminal arrests with mere touches, attempted seizures, and batteries. It is for *the majority* to show the Fourth Amendment commands this result. No amount of rhetorical maneuvering can obscure how flat it has fallen: Even its own authorities do more to undermine than support its thesis. If common law courts never contemplated the majority's odd definition of a criminal arrest—and this Court didn't either for more than two centuries—that can only be further proof of its implausibility.

The majority asks us to glide past another problem too. It acknowledges that its debt-collection cases required a "laying on of hands" to complete an arrest. But it says we should overlook that rule as an accident of antiquity. "Touchings" by "firearm," we are told, were unknown to "founding-era courts," and no "officer used a gun to apprehend a suspect" before 1850. *Ante*, at 9. Never mind the shot heard round the world in 1775 and the adoption of the Second Amendment. Never mind that as early as 1592, when a bailiff "feared resistance" and thus "brought with him" a gun "to arrest" someone, a common law court deemed it lawful because "[t]he sheriff or any of his ministers may for the better execution of justice carry with them offensive or defensive weapons." *Seint John's Case*, 5 Co. Rep. 71b, 77 Eng. Rep. 162, 162–163 (K. B. 1592). Never mind that even tax collectors were carrying guns by the

1680s. *E.g.*, *Dickenson* v. *Watson*, Jones, T. 205, 205–206, 84 Eng. Rep. 1218, 1218–1219 (K. B. 1682). And never mind, too, that the majority's problem isn't limited to guns. It fails to cite any case in which a touching by *any* weapon was deemed sufficient to effect an arrest. Seemingly, the majority would have us believe that bailiffs wielding anything but their fists were beyond the framers' imagination.

Faced with all these problems, the majority tacks. It scrambles to locate a case—any case—suggesting that common law courts considered "touchings" by weapon enough to effect an arrest in the debt-collection context. Ultimately, the majority asks us to dwell at length on the Countess of Rutland's case. In at least that lone instance, the majority promises, we will find bailiffs who arrested a debtor by touching her with an object (a mace) rather than a laying on of hands. See *ante*, at 7–8 (citing *Countess of Rutland's Case*, 6 Co. Rep. 52b, 54a, 77 Eng. Rep. 332 (Star Chamber 1605)). But it turns out the dispute concerned whether a countess could be civilly arrested *at all*, not when or how the arrest was completed. The court had no reason to (and did not) decide whether the bailiffs accomplished their arrest when they "shewed her their mace," "touch[ed]" her with the mace, or "compelled the coachman to carry" her to jail. *Id.*, at 54a, 77 Eng. Rep., at 336. And no one questions that these things together—a show of authority followed by compelled detention—have always been enough to complete an arrest. Not even minor royalty can rescue the majority.

So the majority tacks again. Now it asks us to dispense with the common law's "laying on of hands" requirement as an "artificial" rule. *Ante*, at 8. Distinguishing between "touchings" by hand and by weapon, it says, "calls to mind the unavailing defense of the person who 'persistently denied that he had laid hands upon a priest, for he had only cudgelled and kicked him.'" *Ibid.* But the quip exposes the majority's bind. To get where it wishes to go, the majority

not only must rework the rules found in the cases on which it relies, it must also abandon their rationale. The debt-collection cases treated the "laying on of hands" as a sign of *possession*.[5] Maybe the possession was more "constructive" or even fictional than "actual." See *ante*, at 16. But the idea was that someone who stood next to a debtor and laid hands on him could theoretically exercise a degree of control over his person. Common law courts never said the same of bailiffs who fired arrows at debtors, shot them with firearms, or cudgeled them as they ran away. Such conduct might have amounted to a *battery*, but it was never deemed sufficient to constitute an *arrest*. Doubtless that's why when a tax collector shot a man in the eye with a (supposedly unavailable) firearm in 1682, the man sued the officer for "assault, battery, and wounding"—*not* false imprisonment. See *Dickenson*, Jones, T., at 205, 84 Eng. Rep., at 1218–1219.

The majority implores us to study the common law history of arrests. But almost immediately, the majority realizes it cannot find what it seeks in the history of criminal arrests. So it is forced to disinter a long-abandoned mere-touch rule from civil bankruptcy practice. Then it must import that rule into the criminal law. And because even that isn't enough to do the work it wishes done, the majority must jettison both the laying on of hands requirement and the rationale that sustained it. All of which leaves us con-

—————

[5] That is why the mere-touch cases often discussed the "corporal possession of the debtor." *E.g.*, *Sandon* v. *Jervis*, El. Bl. & El. 935, 941–942, 120 Eng. Rep. 758 (K. B. 1858) (Hill, J.). A "corporal" touch was a legal term of art and was frequently used in the context of determining the possession of goods. *E.g.*, *Jordan* v. *James*, 5 Ohio 88, 98 (1831) (stating that an owner "may deliver any chattel he sells, symbolically and constructively, as well as by corporal touch"); see also 2 W. Blackstone, Commentaries on the Laws 448–449, n. 16 (J. Chitty ed. 1826); Friedman, Formative Elements in the Law of Sales: The Eighteenth Century, 44 Minn. L. Rev. 411, 445 (1960).

fusing seizures with their attempts and arrests with batteries.

The common law offers a vast legal library. Like any other, it must be used thoughtfully. We have no business wandering about and randomly grabbing volumes off the shelf, plucking out passages we like, scratching out bits we don't, all before pasting our own new pastiche into the U. S. Reports. That does not respect legal history; it rewrites it.

## C

If text and history pose challenges for the majority, so do this Court's precedents. The majority admits (as it must) that the seizure of an object occurs only through taking possession. *Ante*, at 4. The majority also admits (as it must) that the seizure of a person through a "show of authority" occurs only if the suspect submits to an officer's possession. *Ante*, at 15. But the majority fails to acknowledge that this Court has *also* said the same principle governs the seizure of persons effected through the use of force.

In *Terry* v. *Ohio*, 392 U. S. 1 (1968), the Court explained that "*[o]nly* when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.*, at 19, n. 16 (emphasis added). The restraint of liberty *Terry* referred to was "interference" with a person's "freedom of movement." *United States* v. *Jacobsen*, 466 U. S. 109, 113, n. 5 (1984). As the Court put it in *Brower* v. *County of Inyo*, 489 U. S. 593 (1989), a decision issued just two years before *Hodari D.*: "It is clear, in other words, that a Fourth Amendment seizure" occurs "only when there is a governmental termination of freedom of movement through means intentionally applied." 489 U. S., at 597 (emphasis deleted).

Rather than follow these teachings, the majority disparages them. After highlighting (multiple times) that Justice Scalia authored *Hodari D.*'s dicta, the majority turns about

and faults his opinion for the Court in *Brower* for "improperly eras[ing] the distinction between seizures by *control* and seizures by *force*." *Ante*, at 14. The majority continues on to blame other of our decisions, too, for "hav[ing] not always been attentive" to this supposedly fundamental distinction. *Ibid.* But this Court has not been "[in]attentive" to a fundamental Fourth Amendment distinction for over two centuries, let alone sought to "erase" it. In truth, the majority's "distinction" is a product of its own invention. This Court has always recognized that *how* seizures take place can differ. Some may take place after a show of authority, others by the application of force, still others after a polite request. But to *be* a "seizure," the same result has always been required: An officer must acquire possession.

### IV

If text, history, and precedent cannot explain today's result, what can? The majority seems to offer a clue when it promises its new rule will help us "avoi[d] . . . line-drawing problems." *Ante*, at 15–16 (internal quotation marks omitted). Any different standard, the majority worries, would be "difficult to apply." *Ante*, at 15.

But if efficiency in judicial administration is the explanation, it is a troubling one. Surely our role as interpreters of the Constitution isn't to make life easier for ourselves. Cf. Calabresi & Lawson, The Rule of Law as a Law of Law, 90 Notre Dame L. Rev. 483, 488 (2014). Nor, for that matter, has the majority even tried to show that the traditional possession rule—in use "[f]rom the time of the founding," *Hodari D.*, 499 U. S., at 624—has proven unreasonably difficult to administer. Everyone agrees, too, that the possession rule will continue to govern when it comes to the seizures of objects and persons through a show of authority. So, rather than simplify things, the majority's new rule for "mere touch" seizures promises only to add another layer of complexity to the law.

Even within its field of operation, the majority's rule seems destined to underdeliver on its predicted efficiencies. The majority tells us that its new test requires an "objective intent to restrain." *Ante*, at 10. But what qualifies is far from clear. The majority assures us that a "tap on the shoulder to get one's attention will rarely exhibit such an intent." *Ibid.* Suppose, though, the circumstances "objectively" indicate that the tap was "intended" to secure a person's attention for a minute, a quarter hour, or longer. Would that be enough?

Then there's the question what kind of "touching" will suffice. Imagine that, with an objective intent to detain a suspect, officers deploy pepper spray that enters a suspect's lungs as he sprints away. Does the application of the pepper spray count? Suppose that, intending to capture a fleeing suspect, officers detonate flash-bang grenades that are so loud they damage the suspect's eardrum, even though he manages to run off. Or imagine an officer shines a laser into a suspect's eyes to get him to stop, but the suspect is able to drive away with now-damaged retinas. Are these "touchings"? What about an officer's bullet that shatters the driver's windshield, a piece of which cuts her as she speeds away? Maybe the officer didn't touch the suspect, but he set in motion a series of events that yielded a touching. Does that count? While assuring us that its new rule will prove easy to administer, the majority refuses to confront its certain complications. Lower courts and law enforcement won't have that luxury.

If efficiency cannot explain today's decision, what's left? Maybe it is an impulse that individuals like Ms. Torres *should* be able to sue for damages. Sometimes police shootings are justified, but other times they cry out for a remedy. The majority seems to give voice to this sentiment when it disparages the traditional possession rule as "artificial" and promotes its alternative as more sensitive to "personal security" and "new" policing realities. *Ante*, at 8–9. It takes

pains to explain, too, that its new rule will provide greater protection for personal "privacy" interests, which we're told make up the "essence" of the Fourth Amendment. *Ante*, at 16 (internal quotation marks omitted).

But tasked only with applying the Constitution's terms, we have no authority to posit penumbras of "privacy" and "personal security" and devise whatever rules we think might best serve the Amendment's "essence." The Fourth Amendment allows this Court to protect against specific governmental actions—unreasonable searches and seizures of persons, houses, papers, and effects—and that is the limit of our license. Besides, it's hard to see why we should stretch to invent a new remedy here. Ms. Torres had ready-made claims for assault and battery under New Mexico law to test the officers' actions. See N. M. Stat. Ann §41–4–12 (2020). The only reason this case comes before us under §1983 and the Fourth Amendment rather than before a New Mexico court under state tort law seems to be that Ms. Torres (or her lawyers) missed the State's two-year statutory filing deadline. See Tr. of Oral Arg. 16–17; Brief for Respondents 20, n. 4. That may be a misfortune for her, but it is hardly a reason to upend a 230 year-old understanding of our Constitution.

Nor, if we are honest, does today's decision promise much help to anyone else. Like Ms. Torres, many seeking to sue officers will be able to bring state tort claims. Even for those whose only recourse is a federal lawsuit, the majority's new rule seems likely to accomplish little. This Court has already said that a remedy lies under §1983 and the Fourteenth Amendment for police conduct that "shocks the conscience." *County of Sacramento* v. *Lewis*, 523 U. S. 833, 840, 845–847 (1998). At the same time, qualified immunity poses a daunting hurdle for those seeking to recover for less egregious police behavior. In our own case, Ms. Torres has yet to clear that bar and still faces it on remand. So, at the end of it all, the majority's new rule will help only those who

(1) lack a state-law remedy, (2) evade custody, (3) after some physical contact by the police, (4) where the contact was sufficient to show an objective intent to restrain, (5) and where the police acted "unreasonably" in light of clearly established law, (6) but the police conduct was *not* "conscience shocking." With qualification heaped on qualification, that can describe only a vanishingly small number of cases.

Even if its holding offers little practical assistance to anyone, perhaps the majority at least hopes to be seen as trying to vindicate "personal security" and the "essence" of "privacy" when it derides the traditional possession rule as "artificial." But an attractive narrative cannot obscure the hard truth. Not only does the majority's "mere touch" rule allow a new cause of action in exceedingly few cases (non-conscience-shocking-but-still-unreasonable batteries intended to result in possession that don't achieve it). It supplies no path to relief for otherwise identical near-misses (assaults). A fleeing suspect briefly touched by pursuing officers may have a claim. But a suspect who evades a hail of bullets unscathed, or one who endures a series of flash-bang grenades untouched, is out of luck. That distinction is no less "artificial" than the one the law has recognized for centuries. And the majority's new rule promises such scarce relief that it can hardly claim more sensitivity to "personal security" than the rule the Constitution has long enshrined.

In the face of these concerns, the majority replies by denying their relevance. It says there is "no call" to "surmise" that its decision rests on anything beyond an "analysis of the common law of arrest." *Ante*, at 17. But there is no surmise about it. The majority itself tells us that its decision is *also* justified by the need to "avoi[d] . . . line-drawing problems," protect "personal security," and advance the "privacy" interests that form the "essence" of the Fourth Amendment. Having invoked these sundry considerations,

it's hard to see how the majority might disown them.

\*

To rule as it does, the majority must endow the term "seizure" with two different meanings at the same time. It must disregard the dominant rule of the common law. It must disparage this Court's existing case law for erasing distinctions that never existed. It cannot even guarantee that its new rule will offer great efficiencies or meaningfully vindicate the penumbral promises it supposes. Instead, we are asked to skip from one snippet to another, finally landing on a long-abandoned debt-collection practice that must be reengineered to do the work the majority wishes done. Our final destination confuses a battery for a seizure and an attempted seizure with its completion. All this is miles from where the standard principles of interpretation lead and just as far from the Constitution's original meaning. And for what? A new rule that may seem tempting at first blush, but that offers those like Ms. Torres little more than false hope in the end.

Respectfully, I dissent.