IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-680

No. COA21-701

Filed 18 October 2022

Orange County, No. 19 CRS 052926

STATE OF NORTH CAROLINA

v.

JESSICA EAGLE, Defendant.

Appeal by Defendant from an order entered on 17 March 2021 and judgment entered on 10 May 2021 and from the denial of a Motion for Appropriate Relief on 13 October 2021; all heard by Judge R. Allen Baddour, Jr., in Orange County Superior Court. Heard in the Court of Appeals 10 August 2022.

*Attorney General Joshua H. Stein, by Assistant Attorney General Liliana R. Lopez, for the State.*

*Coleman, Gledhill, Hargrave, Merritt, & Rainsford, P.C., by James Rainsford and Cyrus Griswold, for Defendant.*

JACKSON, Judge.

The issue in this case is whether a driver is "seized" within the meaning of the Fourth Amendment when a police officer in a marked police cruiser drives slowly past a parked vehicle at night, backs up, pulls in behind the vehicle while activating the patrol car's blue lights, blocks the driver's exit, and then remains in the police cruiser while checking Defendant's license plate. Because we conclude that no reasonable

person would believe she was free to drive off under such circumstances, we hold that Defendant was seized for purposes of the Fourth Amendment of the United States Constitution as well as Article I, § 20 of the North Carolina Constitution at the point in time when Deputy Belk pulled in behind Defendant while activating the patrol car's blue lights and blocked her exit. The trial court accordingly erred in denying Defendant's motion to suppress.

## I.        Factual and Procedural Background

On 14 November 2019, Deputy R. Belk of the Orange County Sheriff's Department was performing nightly business checks along Dairyland Road while driving her marked police cruiser. At 3:19 A.M., after Deputy Belk finished her check of the Maple View Farm Store, she observed a white sedan pull into the driveway of the nearby Maple View Agriculture Center. The business was not open at the time, and the entrance into the Maple View Agriculture Center was blocked by a locked gate. Deputy Belk drove slowly past the Maple View Agriculture Center driveway. Deputy Belk testified that at that point she was waiting to see if the vehicle was just turning around. The first thirty seconds of her dashboard camera reflects that Deputy Belk never completely went past the entrance. Instead, she put her car in reverse, slowly backed down Dairyland Road, and then activated her blue lights as she pulled into the driveway, coming to a stop at an angle the trial court found to be approximately 10 feet behind the white sedan. Deputy Belk further testified that she

had observed no criminal violations prior to turning her blue lights on and pulling in behind Defendant's vehicle, thereby conceding the absence of reasonable suspicion.

¶ 3          Deputy Belk testified that because the road was dark and a portion of her police cruiser jetted into Dairyland Road, she turned on her blue lights for safety reasons, warning any approaching vehicles of her presence. Deputy Belk did not immediately exit her vehicle to check on the occupants as one might in a welfare check. [1] Instead, she calmly sat in her car and ran the plate. Both the driver and the passenger of the white sedan remained in the vehicle. Deputy Belk relayed the license plate information to communications and after approximately one minute, she exited her police cruiser and, with her firearm on her side, approached the driver's side door of the white sedan.

¶ 4          Once Deputy Belk approached, she introduced herself to Defendant who was seated in the driver's seat. She asked Defendant what she was doing and while doing so, noticed a strong odor of alcohol coming from inside the vehicle. She also observed that Defendant had red, glassy eyes and slurred speech. Deputy Belk asked Defendant and her passenger for their identification cards, which they produced.

---

[1] We note that the State has never argued and the trial court appears not to have considered whether the community caretaker exception to the reasonable suspicion requirement applied to the case at bar. Therefore, we have not considered the impact of such an exception in our analysis. We have only analyzed at what point Deputy Belk seized Defendant for purposes of the Fourth Amendment.

After they handed her their identification cards, Deputy Belk returned to her patrol vehicle with their cards. At the later suppression hearing, the trial court concluded that Defendant was not seized at any point up until Deputy Belk took the identification cards to the patrol vehicle.

¶ 5    After a district court bench trial on 30 July 2020, Defendant was found guilty of impaired driving and sentenced as a level five offender to 18 months of unsupervised probation in addition to a two-day suspended sentence. Defendant appealed the district court's judgment to Orange County Superior Court on 30 July 2020. On 15 February 2021, Defendant filed a motion to suppress with the required supporting affidavit in the superior court, challenging the stop of her vehicle as an unlawful seizure and detention. The motion included the following:

> 4.    Deputy Belk observed that Defendant had pulled into the driveway so she slowly drove a few feet past the driveway. She then stopped, slowly backed up on the highway, turned on her blue lights, and then pulled in behind Defendant's vehicle.
>
> 5.    She parked a few feet from Defendant's rear bumper. (Deputy Belk Dashcam video 0:00-0:30).
>
> 6.    Defendant's car was blocked in by Deputy Belk's patrol vehicle because there was also a locked gate directly in front of Defendant's car.
>
> 7.    Deputy Belk remained in her vehicle with the blue lights on for approximately one minute before she got out of the car.

. . .

27.     Because she stayed in the car, Defendant acquiesced to Deputy Belk's show of authority and therefore a seizure was effectuated, implicating Defendant's constitutional rights under the Fourth Amendment to the United States Constitution and Article 20 of the North Carolina Constitution.

28.     In this case, Deputy Belk took the actions necessary to convey to a reasonable person that they were not free to leave.  She not only blocked Defendant's path out of the driveway; but also she activated her blue lights as she was pulling in to block Defendant's path and remained parked behind Defendant with the blue lights on for over one minute before Officer Belk exited her marked patrol vehicle.

29.     No reasonable person would feel free to leave. Blocked in by a marked patrol cruiser with its blue lights flashing, late at night with no other cars around. This is certainly a show of authority that restrained Defendant's liberty.  At this point Defendant was illegally seized because Deputy Belk had no reasonable suspicion for her conduct.

. . .

31.     Deputy Belk had no reasonable articulable suspicion that criminal activity was afoot and thus her actions violated Defendant's rights under the United States Constitution and the North Carolina Constitution.

The superior court heard arguments on Defendant's motion to suppress on 15 February 2021.  Deputy Belk was the only witness who testified at the hearing. Dashboard camera footage and the officer's body camera footage of the interaction

were admitted as Exhibits 1 and 2.

¶ 7        At the conclusion of the hearing, the trial court determined that the encounter between Defendant and Deputy Belk was not a traffic stop, but was a voluntary encounter up until the point where Deputy Belk took possession of Defendant's identification card.  The trial court therefore denied Defendant's motion to suppress.

¶ 8        On 17 March 2021, the trial court entered a written order denying Defendant's motion to suppress that included the following pertinent Findings of Fact:

> 4.        Deputy Belk observed a white sedan traveling on Dairyland Road and pull into the driveway of the Maple View Agriculture Center located at 3501 Dairyland Road at approximately 3:19am.
>
> 5.        The Maple View Agriculture Center was not open at 3:19am and there was a closed gate locking all traffic from driving towards the building.
>
> 6.        The white sedan stopped in the driveway at the closed gate.
>
> 7.        Deputy Belk observed the vehicle pull into the driveway and waited to see if the white sedan would turn around.
>
> 8.        The white sedan continued to sit parked in front of the closed gate.
>
> 9.        Deputy Belk pulled behind the white sedan, stopping approximately ten feet behind the white sedan and activated the blue lights on her vehicle.
>
> . . .
>
> 14.        Deputy Belk briefly touched the back of the white

sedan with her hand before making contact with the driver, Ms. Eagle.

Based on these findings, the trial court concluded as a matter of law:

> 2.     The Court concludes that Ms. Eagle was seized under the Fourth Amendment at the point Deputy Belk took Ms. Eagle's identification and returned to her law enforcement vehicle. Until that point, Ms. Eagle was not seized under the Fourth Amendment and the encounter was a voluntary encounter.
>
> . . .
>
> 4.     Here, the circumstances surrounding the incident indicate that a reasonable person would have believed that she was not free to leave when Deputy Belk took possession of Ms. Eagle's identification cards and returned to the vehicle.  At this point is when a seizure occurred under the Fourth Amendment. Until that point, the encounter was a voluntary encounter.
>
> 5.     The Court finds that a seizure did not occur when Deputy Belk pulled behind Ms. Eagle's vehicle and initiated the blue lights. Using the *Isenhour* factors, the Court finds the following:  Deputy Belk was the only law enforcement officer present at this time and did not conduct herself in a manner that is considered threatening. Deputy Belk did not display a weapon during the interaction and only used a hand-held flashlight for light, given that it was 3:19am.  Deputy Belk did not physically touch Ms. Eagle and Deputy Belk's momentarily touching of the back of Ms. Eagle's vehicle did not rise to a seizure. Deputy Belk used a calm tone throughout the conversation with Ms. Eagle.  Deputy Belk did not raise her voice, yell, or give any commands to Ms. Eagle.  Ms. Eagle was cooperative with Deputy Belk and answered all questions posed regarding Ms. Eagle being lost voluntarily.

> 6.      Pursuant to *State v. Nunez*, 849 S.E.2d 573 (2020), the Court finds that the mere activation of Deputy Belk's blue lights did not constitute a seizure under the Fourth Amendment.  For a defendant to be seized under the Fourth Amendment, he must submit, or yield, to an officer's activation of blue lights or siren[.]

Two months later, defense counsel filed a Notice of Intent to Plead Guilty and Reserve the Right to Appeal the Denial of the Motion to Suppress, which gave notice to the court of her intention to plead guilty and appeal the denial of her motion to suppress.  Defendant subsequently pleaded no contest to driving while impaired. This time, the trial court found Defendant guilty as a level four offender and sentenced her to a 120-day sentence, suspended, and placed her on supervised probation for 12 months.

Defendant gave oral notice of appeal in open court and timely filed a written notice of appeal with this Court on 21 May 2021.

On 21 May 2021, Defendant filed a Motion for Appropriate Relief ("MAR"), requesting that the trial court reconsider its denial of her motion to suppress based upon the recent appellate decision of *State v. Steele*, 277 N.C. App. 124, 2021-NCCOA-148.  The trial court received written briefs and arguments from Defendant and from the State.  Judge Baddour denied the MAR on 13 October 2021, and Defendant again gave timely written notice of appeal.

## II.  Analysis

## A. Standard of Review

On appeal of an order denying a motion to suppress, we conduct a two-part review: (1) to determine whether there is "competent evidence" to support the trial court's findings of fact, and (2) to determine whether "those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). If the findings of fact are supported by substantial competent evidence, then they are binding on appeal. *State v. Gabriel*, 192 N.C. App. 517, 519, 665 S.E.2d 581, 584 (2008). However, the trial court's conclusions of law are reviewed de novo. *State v. Edwards*, 185 N.C. App. 701, 702, 649 S.E.2d 646, 648 (2007). Because we reverse on the issue of the motion to suppress, we do not need to further address Defendant's MAR.

## B. Findings of Fact

Defendant does not challenge any of the findings of fact contained in the trial court's order. "Unchallenged findings of fact, where no exceptions have been taken, are presumed to be supported by competent evidence and binding on appeal." *State v. McLeod*, 197 N.C. App. 707, 711, 682 S.E.2d 396, 398 (2009) (internal marks and citation omitted). With few and minor exceptions, the parties do not disagree with each other on the facts, no doubt due to the camera footage available from the interaction.

There is also no dispute that Deputy Belk had not observed a crime prior to

her pulling behind the Defendant and activating her blue lights. In fact, Defendant

and the State agree that Defendant was seized at some point during this encounter.

The dispositive issue is at what point this encounter qualified as a seizure as opposed

to a voluntary encounter, which would not implicate the Fourth Amendment.

**C. Challenged Conclusions of Law—Motion to Suppress**

Defendant argues that the trial court erred in denying her motion to suppress,

contending that she was seized the moment that Deputy Belk pulled in behind her

stopped vehicle and activated the blue lights. The State contends (and the trial court

found) that up until the Deputy took Defendant's identification card that Defendant

was free to drive off and was therefore not seized for purposes of the Fourth

Amendment.

The trial court made the following conclusions of law in determining that

Defendant was not seized by Deputy Belk under the Fourth Amendment up until she

asked for her identification:

> 2.     The Court concludes that Ms. Eagle was seized
> under the Fourth Amendment at the point Deputy Belk
> took Ms. Eagle's identification and returned to her law
> enforcement vehicle. Until that point, Ms. Eagle was not
> seized under the Fourth Amendment and the encounter
> was a voluntary encounter.
>
> . . .
>
> 4.     Here, the circumstances surrounding the incident
> indicate that a reasonable person would have believed that

she was not free to leave when Deputy Belk took possession of Ms. Eagle's identification cards and returned to the vehicle. At this point is when a seizure occurred under the Fourth Amendment. Until that point, the encounter was a voluntary encounter.

5. The Court finds that a seizure did not occur when Deputy Belk pulled behind Ms. Eagle's vehicle and initiated the blue lights. Using the *Isenhour* factors, the Court finds the following: Deputy Belk was the only law enforcement officer present at this time and did not conduct herself in a manner that is considered threatening. Deputy Belk did not display a weapon during the interaction and only used a hand-held flashlight for light, given that it was 3:19am. Deputy Belk did not physically touch Ms. Eagle and Deputy Belk's momentarily touching of the back of Ms. Eagle's vehicle did not rise to a seizure. Deputy Belk used a calm tone throughout the conversation with Ms. Eagle. Deputy Belk did not raise her voice, yell, or give any commands to Ms. Eagle. Ms. Eagle was cooperative with Deputy Belk and answered all questions posed regarding Ms. Eagle being lost voluntarily.

6. Pursuant to *State v. Nunez*, 849 S.E.2d 573 (2020), the Court finds that the mere activation of Deputy Belk's blue lights did not constitute a seizure under the Fourth Amendment. For a defendant to be seized under the Fourth Amendment, he must submit, or yield, to an officer's activation of blue lights or siren[.]

Ultimately, we agree with Defendant that the trial court erred in concluding that the encounter between herself and Deputy Belk was not a seizure under the Fourth Amendment at the point in time when Deputy Belk pulled in behind Defendant's vehicle while activating her blue lights and blocked Defendant's exit.

The Fourth Amendment of the United States Constitution protects "the right

of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend IV. Article I, § 20 of the North Carolina Constitution likewise "protect[s] against unreasonable searches and seizures." *State v. Otto*, 366 N.C. 134, 136, 726 S.E.2d 824, 827 (2012). "Fourth Amendment rights are enforced primarily through 'the exclusionary rule,' which provides that evidence derived from an unconstitutional search or seizure is generally inadmissible in a criminal prosecution of the individual subjected to the constitutional violation." *State v. McKinney*, 361 N.C. 53, 58, 637 S.E.2d 868, 872 (2006).

¶ 19 It is well-established that "a traffic stop is considered a 'seizure' within the meaning of" both the federal and state constitutions, and that a traffic stop is only constitutional if supported by reasonable suspicion. *Otto*, 366 N.C. at 136-37, 726 S.E.2d at 827. However, the issue in this case is not whether Deputy Belk had reasonable suspicion to stop Defendant (she admits she did not), rather, the issue is when, during the encounter between Defendant and Deputy Belk, Defendant was seized.

¶ 20 Not every interaction between citizens and law enforcement constitutes a seizure. The United States Supreme Court has "repeatedly held that mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). *See also State v. Brooks*, 337 N.C. 132, 141, 446 S.E.2d 579, 585 (1994) (internal marks and citation omitted) (explaining that "communication between the

police and citizens involving no coercion or detention" does not constitute a seizure). Thus, officers do not violate the Fourth Amendment "merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *State v. Isenhour,* 194 N.C. App. 539, 542, 670 S.E.2d 264, 267 (2008) (internal marks and citation omitted).

¶ 21          In contrast, a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen[.]" *Terry v. Ohio*, 392 U.S. 1, 20 n. 16 (1968). *See also State v. West*, 119 N.C. App. 562, 566, 459 S.E.2d 55, 58 (1995) ("A seizure does not occur until there is a physical application of force or submission to a show of authority."). A show of authority constitutes a seizure when "under the totality of the circumstances a reasonable person would feel that he was not free to decline the officers' request or otherwise terminate the encounter." *Brooks*, 337 N.C. at 142, 446 S.E.2d at 586. *See also Bostick*, 501 U.S. at 437 (a show of authority occurs when the officer's conduct "would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business") (internal marks and citation omitted). When a sufficient show of authority is made, it is possible for an officer to seize a person without ever laying hands on that person. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (noting that when there is "an assertion of authority" by an officer, "no actual, physical touching is essential" for the encounter to qualify as a seizure) (internal marks and

citation omitted).

¶ 22 In determining whether a show of authority has occurred, relevant circumstances include "the number of officers present, whether the officer displayed a weapon, the officer's words and tone of voice, any physical contact between the officer and the individual, whether the officer retained the individual's identification or property, the location of the encounter, and whether the officer blocked the individual's path." *State v. Icard*, 363 N.C. 303, 309, 677 S.E.2d 822, 827 (2009). What constitutes a seizure "will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). As the State correctly points out in its brief, the test is whether under the totality of circumstances, "a reasonable person would have believed that he was not free to leave." *State v. Campbell*, 359 N.C. 644, 662, 617 S.E.2d 1, 13 (2005) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

¶ 23 Here, the trial court relied heavily on *State v. Nunez*, 274 N.C. App. 89, 849 S.E.2d 573 (2020), wherein an officer responded to a call of a disabled vehicle in the middle of a public vehicular area and not parked in a parking space. The Court held that this did not constitute a seizure, noting that (1) the act of turning on the blue lights behind a car in the middle of a public vehicular area in and of itself is not enough to constitute a seizure; and (2) the officer took no action that caused the defendant's vehicle to stop moving nor did the officer otherwise impede the movement

of the defendant's vehicle in any way. *Id*. at 93, 849 S.E.2d at 575-76.

¶ 24    The *Nunez* opinion cites *State v. Turnage,* 259 N.C. App. 719, 726, 817 S.E.2d 1, 6, *writ denied, temp. stay dissolved,* 371 N.C. 786, 821 S.E.2d 438 (2018), and its holding that "the mere activation of the vehicle's blue lights did not constitute a seizure as [the] [d]efendant did not yield to the show of authority."  In both *Nunez* and *Turnage,* this Court also noted that neither of the defendants' movement was in any way impeded by the officers.  It is on this basis that both *Nunez* and *Turnage* can be distinguished from this case as Deputy Belk pulled in close enough behind Defendant to block her available exit, thus impeding Defendant's movement.[2]

¶ 25     Oddly enough, the State and the trial court also base their arguments upon this Court's decision in *State v. Isenhour*, 194 N.C. App. 539, 670 S.E.2d 264 (2008). In that case, officers were patrolling an area known for having a lot of drug and prostitution activity when they observed a car with two passengers sitting still for a ten-minute period.  *Id*. at 540, 670 S.E.2d at 266.  The officers pulled up to the defendant's vehicle in their marked patrol car, parking approximately eight feet

_____

[2] The restriction of movement factor in the seizure analysis is highlighted in *State v. Wilson*, 250 N.C. App. 781, 793 S.E.2d 737 (2016), *aff'd,* 370 N.C. 389 (2017).  In *Wilson*, a police officer was standing on the side of a road and motioned for a passenger to stop.  *Id.* at 782, 793 S.E.2d at 738.  This Court determined that because the officer did not restrict the defendant's movement either with his person or with his police cruiser, and there was no other display of police authority with either the cruiser's lights or with his weapon, the defendant was not seized for purposes of the Fourth Amendment.  *Id.* at 785-86, 793 S.E.2d at 741.

away. *Id.* They got out of their car and approached the defendant's vehicle. *Id.* The officers did not activate their blue lights. *Id.* at 544, 670 S.E.2d at 268.

The *Isenhour* Court found that based upon the totality of the circumstances, the defendant was not seized. *Id.* This Court specifically noted that "there [was] no suggestion in the record that Officer Ferguson's car physically blocked the defendant's car, thus preventing him from driving away." *Id.* This Court also highlighted the absence of any psychological barriers that may have discouraged the defendant from leaving such as turning on the blue cruiser lights. *Id.* In contrast to *Isenhour*, in the case at bar, Deputy Belk activated her blue lights as she pulled in behind Defendant and also positioned her cruiser in such a manner that it blocked Defendant's exit path.

At a minimum, Deputy Belk impeded Defendant's movement as Defendant would have had to narrowly skirt around Deputy Belk's police cruiser while backing up in order to avoid either hitting the cruiser or running off the road. To impede is "to interfere with or slow the progress of" something—in other words, to hinder or obstruct movement. *Impede*, Merriam-Webster.com Dictionary, (last accessed 1 September 2022). Based on the trial court's findings and the video evidence, there is no dispute that Defendant was stopped facing and close to a locked gate, meaning there was only one way out of the driveway. Additionally, the trial court found that Deputy Belk stopped approximately ten feet behind Defendant and the video shows

Deputy Belk did so at an angle. The result of this positioning meant that Defendant's ability to utilize her only available exit was hindered and any attempt to exit, whether backing up slowly or attempting a multi-point turn between the gate and the cruiser, was slowed. "We agree that when an officer blocks a defendant's car from leaving the scene, particularly when, as here, the officer has followed the car, the officer demonstrates a greater show of authority than does an officer who just happens to be on the scene and engages a citizen in conversation." *United States v. Jones*, 678 F.3d 293, 302 (4th Cir. 2012); *see also United States v. Green*, 111 F.3d 515, 520 n.1 (7th Cir. 1997) (concluding that when "the officers pulled their car in behind the [defendant's car], blocking the car's exit . . . a reasonable person would not feel that he was free to leave").

¶ 28        Moreover, a reasonable motorist would surely feel less at liberty to "ignore the police presence and go about his business" when a police officer in a marked police cruiser pulls in behind her while activating the blue lights and blocks her exit. *Bostick*, 501 U.S. at 437. In fact, in such a situation most people would feel compelled to remain in their car and wait to speak with the officer, knowing that attempting to leave would only end in trouble and/or danger. This pressure to comply becomes especially apparent when examining the criminal consequences that might follow if a person ignores an officer's blue lights.

¶ 29        For example, N.C. Gen. Stat. § 14-223 makes it unlawful to "willfully and

unlawfully resist, delay, or obstruct a public officer in discharging or attempting to discharge a duty of his office." N.C. Gen. Stat. § 14-223(a) (2021). A violation of this section can result in a Class 2 misdemeanor charge. We have previously upheld a conviction under this statute when officers approached a defendant who was asleep with his car stopped in the middle of the road, but the defendant would not roll down his window, refused to speak with them, and acted uncooperatively. *See State v. Hoque*, 269 N.C. App. 347, 349-50, 837 S.E.2d 464, 468-69 (2020).

¶ 30    Although the State attempts to distinguish this case from the facts in *State v. Steele*, it misses the point.

> [A] person in Defendant's situation finds [herself] caught in a Catch-22—comply with the officer's show of authority and relinquish her Fourth Amendment rights; or ignore the officer's show of authority and be arrested for resisting a public officer [or potentially worse outcomes if the officer feels the noncompliance is threatening]. This cannot be consistent with the guarantees in the Fourth Amendment and Article I, § 20 of the North Carolina Constitution.

*Steele*, 277 N.C. App. at 136, 2021-NCCOA-148, ¶ 36. As we stated in *Steele*, "when a person would likely face criminal charges for failing to comply with an officer's 'request,' then that person has been seized within the meaning of the Fourth Amendment and Article I, § 20 of our state Constitution." *Id.* Furthermore, we do not want to suggest to the public that when an officer pulls behind them at night while activating their blue lights, stays in car for a minute, and then begins to exit

the vehicle that they are free to attempt to back out of the situation as long as they do not make contact with the officer or drive in their direction (which could be considered attempted assault). Such actions run the risk of escalating the situation, causing an officer to understandably feel threatened and potentially resulting in a car chase or the use of deadly force. There is inherent danger any time a driver tries to exit a situation in which a police officer has indicated via activation of their blue lights or some other show of authority that they intend to speak with the driver. *See Torres v. Madrid*, 141 S. Ct. 989 (2021) (where officers, after approaching in tactical vests marked with police identification and holding guns, fired 13 rounds at a woman who drove away even though evidence indicated the officers were not standing in the path of the vehicle).

¶ 31 "The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Michigan v. Summers*, 452 U.S. 692, 702-703 (1981). That is what we should all want from interactions between the police and the public in order to prevent escalation. The State implicitly argues that this Defendant was free to try and back her car out from where she was stopped, either while Deputy Belk sat in her car running Defendant's license plate or even while the Deputy walked up to Defendant's window. Given that this incident took place late at night in a rural area with no lighting, we do not know what would have happened if Defendant had reversed her car toward Deputy Belk or

the patrol vehicle in an attempt to leave the scene. Perhaps Defendant might have hit Deputy Belk's patrol vehicle. Or worse, Defendant might have accidentally struck Deputy Belk when she was approaching Defendant's car door. Perhaps any attempt by Defendant to leave would have made Deputy Belk feel threatened, leading her to fire her sidearm. Either way, what started as a simple traffic stop could have escalated to something much worse. Defendant made the only safe and reasonable choice available by remaining in her car at the scene. The State's argument is not only illogical, but it is also potentially dangerous.

¶ 32          In addition to erroneously ignoring the inherently coercive nature of an officer pulling in behind a vehicle, blocking its exit, and activating blue lights while in a marked patrol car, the trial court's analysis failed to adequately account for the time and location of this encounter. *See Icard*, 363 N.C. at 309, 677 S.E.2d at 827 (holding that the location and physical circumstances of the encounter are relevant seizure factors). Here, Deputy Belk first spotted Defendant's vehicle on an otherwise empty street at a little after three o'clock in the morning. She watched Defendant pull into a path with a locked gate. She then slowly drove behind Defendant, reversing her car in the road, driving backwards, pulling behind Defendant and activating her blue lights. A reasonable person would find such an empty, isolated location at such a late time of night, with a gate blocking her forward direction of travel and the Deputy's patrol car with flashing blue lights impeding her backwards direction of travel, to be

intimidating and would also be more susceptible to police pressure, which she otherwise might have felt free to ignore in a sunlit, crowded location.

¶ 33      In sum, when one examines all the attendant circumstances surrounding this encounter, the only reasonable conclusion is that Defendant was seized by Deputy Belk—especially when one examines this encounter from the perspective of a reasonable person in Defendant's position. Around 3:19 A.M. on 14 November 2019, Defendant was lost and pulled into a short driveway that was gated and locked. The street was completely empty aside from Defendant and Deputy Belk, and it was dark due to the absence of street lights on a rural road. Deputy Belk drove slowly past the driveway, only partway past Defendant's car, put her patrol vehicle in reverse, and slowly backed back down the road. Deputy Belk pulled partially into the driveway— activating her lights as she did so—and stopped behind Defendant's car, impeding Defendant's ability to back out of the driveway.

¶ 34      We are not expressing the view that Deputy Belk did anything wrong and it may be true that she did not believe this was a stop. However, when analyzed from the view of a reasonable person in Defendant's position, even at this early point in the encounter, any reasonable person would have realized that they were the target of police suspicion and were likewise not free to drive off. To hold otherwise could instigate the escalation of encounters between the police and drivers in North Carolina and lead to far worse results for those involved.

## II.    Conclusion

Thus, after examining all the attendant facts and circumstances, we conclude that no reasonable person in Defendant's position would have felt free to ignore Deputy Belk's show of authority. Accordingly, we hold that Defendant was seized within the meaning of the Fourth Amendment and Article I, § 20 of the North Carolina Constitution at the point that Deputy Belk pulled in behind Defendant's car while activating her blue lights and blocked Defendant's available exit. Therefore, the trial court erred in denying Defendant's motion to suppress. We reverse the trial court's order denying the motion to suppress and remand this matter back to the trial court for further disposition.

REVERSED AND REMANDED.

Judges MURPHY and CARPENTER concur.